# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**HENRY FLOYD SANDERS,**           )
                                   )
      **Petitioner,**             )
                                   )
**v.**                             )
                                   )    **NO. 3:21-cv-00027**
**WARDEN CHANCE LEEDS,**           )
                                   )    **JUDGE CAMPBELL**
      **Respondent.**            )
                                   )
                                   )

## <u>MEMORANDUM OPINION AND ORDER</u>

Henry Floyd Sanders ("Petitioner") is a state prisoner incarcerated in Whiteville Correctional Facility in Hardeman County, Tennessee. In 2011, a jury convicted him of five counts of aggravated sexual battery and four counts of rape of a child. (Doc. No. 12-6 at 3). The trial court sentenced Petitioner to a total effective sentence of forty years. (*Id*. at 16). Petitioner, proceeding *pro se*, challenges his convictions and sentence under 28 U.S.C. § 2254. The Court finds that an evidentiary hearing is unnecessary to resolve Petitioner's claims. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a federal court is not required to hold an evidentiary hearing."). In addition, after careful review of the lengthy state-court record and the applicable law, the Court finds that Petitioner is not entitled to relief under § 2254, and his Petition (Doc. No. 1) will therefore be **DENIED**.

# I.     BACKGROUND

## A.     Pre-Trial Proceedings, Trial, and Sentencing

### 1.   Pre-Trial Proceedings

On October 21, 2008, a grand jury, impaneled in Davidson County, indicted Petitioner on six counts of intentionally engaging in unlawful sexual contact with A.S., a child less than thirteen years of age, in violation of Tennessee Code Annotated § 39-13-504 (aggravated sexual battery), and four counts of intentionally, knowingly, or recklessly engaging in unlawful sexual penetration of a child less than thirteen years of age, in violation of Tennessee Code Annotated § 39-13-522 (child rape). (Doc. No. 12-1 at 3–13). Petitioner appeared for his arraignment on October 28, 2009 in the Criminal Court for Davidson County, and he pleaded not guilty to the charges against him. (*Id*. at 15). At that time, the trial court appointed counsel to represent Petitioner. (*Id*.) Melissa Harrison, Esq., then-Assistant Public Defender represented Petitioner at trial, along with Jessamine Grice. (*See id.* at 21; *see also* Doc. No. 12-4 at 1).[1]

On August 20, 2010, Petitioner, through counsel, filed a motion to suppress statements he made to A.S.'s mother Latrice Standberry during a recorded conversation he had with her on April 24, 2008. (*Id*. at 16; *see id*. 111 n.1). Ms. Standberry was wearing a body wire, and detectives from the Metropolitan Police Department, including Detective Joshua Mayo, monitored the conversation. (Doc. No. 12-4 at 5:4; *id*. at 162:10–13). Petitioner argued that his statements were coerced because of Ms. Standberry's "lengthy barrage of threats, promises, and lies" of police involvement, prosecution, and media exposure. (Doc. No. 12-1 at 21). After a suppression hearing, the trial court denied Petitioner's motion, and the case proceeded to trial. (*Id*. at 111–19). The jury

---

[1]      Ms. Harrison also represented Petitioner on direct appeal, (*see* Doc. No. 12-18 at 1), and she testified at Petitioner's post-conviction evidentiary hearing.

read via transcript and heard the contents of the body-wire conversation through Detective Mayo's trial testimony. (Doc. No. 12-4 at 166:6–10).[2]

   2. Trial

   Trial commenced on January 31, 2010. (Doc. No. 12-4 at 1). Ms. Standberry, A.S., Detective Mayo, A.S.'s school counselor Peggy Reilly, and licensed clinical nurse and then-director of Our Kids' Center Hollye Gallion testified for the state. (*See* Doc. No. 12-4 at 2). No witnesses testified for the defense. (*See id*.)

   The trial evidence shows that Ms. Standberry and Petitioner met in Mississippi and began a relationship in 2003. (Doc. No. 12-4 at 123:12–16). The two share a son, "J.S." (*Id*. at 122:15).[3] In 2005, Petitioner, Ms. Standberry, A.S., and J.S. moved to Nashville, Tennessee following Hurricane Katrina. (*Id*. at 124). A.S. was seven years old at that time. (*Id*.) The family first lived together at Valley Brook Apartments. (*Id*. at 29:8–16). They then moved to a duplex on Apache Trail, also located in Nashville. (*Id*. at 30:21–23; 31:1–3). In 2007, Petitioner and Ms. Standberry ended their relationship, and Petitioner moved out of the duplex on Apache Trial and moved into an apartment on Linbar Drive. (*Id*. at 66:9–10; *id*. at 127:10–12). Petitioner and Ms. Standberry, however, continued to share child-care responsibilities which involved Petitioner watching A.S. and J.S. while Ms. Standberry worked nightshifts at Walmart. (*Id*. 124:22–25, 125:11–13: 126:17–25; *id*. at 63:1–5, 13–24).

---

[2]   Due to technical difficulties, the trial court could not play the entire April 24, 2008 body-wire conversation for the jury. (Doc. No. 12-4 at 170:7–10). The trial court, however, instructed Detective Mayo to read the relevant portions of the conversation into the record during his testimony. (*Id*.); (*see* Doc. No. 12-13 at 21 n.7).

[3]   J.S. is A.S.'s younger sibling and is A.S.'s half-brother, as they share the same biological mother (Ms. Standberry). (*See* Doc. No. 12-4 at 17:4–6). A.S. is not biologically related to Petitioner. (*See id*.)

3

A.S., who was twelve-years old at the time of the trial, testified to several incidents in which Petitioner sexually abused her. (*Id*. at 27:5–6). Most of the sexual abuse occurred at the residence on Apache Trail, and she stated that it would always occur at night when Ms. Standberry was at work. (*Id*. at 52:20–25; 53:1–7; 63:15–19; *see id*. at 52:20–25 (estimating that the abuse on Apache Trail occurred "seven or eight or nine times")). Two incidents of sexual abuse also occurred when she stayed with Petitioner at his apartment on Linbar Drive. (*Id*. at 66:13–17). She also recalled a time when she felt "nasty" after Petitioner made her sit on his lap when they lived at Valley Brook Apartments. (*Id*. at 40).

In September of 2007, when A.S. was in third grade, she began visiting Ms. Reilly to get help for "a real bad anger problem." (*Id*. at 33:10–11). A.S. had initially disclosed to Ms. Reilly that Ms. Standberry had been hitting her. (*Id.* at 33:19–20; *id*. at 84; *id*. at 102:12–13). On January 25, 2008, A.S. indicated to Ms. Reilly that Petitioner was sexually abusing her. (*Id*. at 34:1–12; 72:21–25; 73:1; 82:24–25; 83:1–3; 90:11–12). Ms. Reilly testified that A.S.'s exact language was that Petitioner "made me take off my clothes and touched my private parts." (*Id*. at 105:6–8). According to Ms. Reilly, A.S. "was hesitant to tell" her "much more than that," and A.S. "kind of shrunk back in her seat." (*Id*. at 105:12–18). Ms. Reilly, a mandatory reporter for child sexual abuse, immediately called the Department of Children's Services ("DCS") and a patrol officer. (*Id*. at 105:19–24; *id*. at 111:11–16).

Ms. Standberry testified that, in January or February of 2008, she learned about the abuse allegations against Petitioner when a caseworker from DCS called her. (*Id*. at 127–28). She believed that, based on her conversation with the DCS caseworker, authorities would be opening an investigation, but months passed before she heard anything from authorities. (*Id*. at 128:12–25). In April of 2008, DCS contacted Ms. Standberry to schedule a forensic interview with A.S. at the

Child Advocacy Center. (*Id*. at 131:24–25; *id*. at 132:1–4). The forensic interview occurred later that month. (*Id*. at 128:24–25; *id*. at 129:9–11; *id*. at 132:5–8).

Ms. Standberry also testified that, prior to A.S.'s forensic interview, she confronted Petitioner about the allegations via telephone, but he denied any wrongdoing. (*Id.* at 132:9–14, 22–23). She attempted to speak with A.S. about the allegations, but "she was not up for talking about it at first." (*Id*. at 133:14–17). According to Ms. Standberry, A.S. would only "disclose[] information to" her regarding the abuse "in pieces." (*Id*. at 133:14–16). On cross-examination she denied physically abusing A.S., and she confirmed that no charges were brought against her. (*Id*. at 139:5).

Following A.S.'s forensic interview, Detective Mayo contacted Ms. Standberry to ask her if she would participate in a body-wire conversation with Petitioner. (*Id*. at 133:25; 134:1–7). Ms. Standberry testified that she initially did not want to participate because she was "nervous," but she eventually agreed because she wanted to get answers "for closure purposes." (*Id*. at 135:15–25). Ms. Standberry testified that, during the recorded conversation, Petitioner admitted to touching A.S. inappropriately. (*Id*. at 137:2–4). At Detective Mayo's request, she spoke with Petitioner a second time via a "controlled phone call," but she could not remember during her testimony if Petitioner made any admissions. (*Id*. at 137:9–12, 21–24). On cross-examination, Ms. Standberry admitted that she lied to Petitioner during the April 24, 2008 body-wire conversation as a tactic to obtain a confession from him. (*Id*. at 143:14–17; *see id*. at 144:4–25). She denied that law enforcement ever told her to lie during the conversation. (*Id*. at 143:9–13).

Ms. Gallion testified as an expert for the state. At the time, Ms. Gallion was the director of Our Kids' Center, a pediatric outpatient clinic of Nashville General Hospital. (Doc. No. 12-5 at 35:21–25). She explained that her role as a clinic director and pediatric nurse practitioner was to

5

perform medical examines on children when "there are concerns of sexual abuse." (*Id.* at 36:1–9). On direct examination, Ms. Gallion explained the general anatomy of a female and testified that it was possible for a perpetrator to penetrate a female victim's genital area without having ruptured the hymen or penetrating the vagina. (*Id.* at 45:14–25). She agreed that "it is possible to have [] penetration [of the victim's genital area] with the hand, with any other object, or with the penis without having [actual] penetration of the vagina." (*Id.* at 43:1–8). She testified that only about seven percent of children whom she would see at Our Kids' Center had physical injury or trauma to their genital area. (*Id.* at 44:10–15). Accordingly, "[n]inety-three percent of the children that" she saw, "male or female, ha[d] completely normal medical examination[s]." (*Id.*) On cross-examination she denied ever examining A.S. (*Id.* at 44:25; *id.* at 45:1–2).[4]

After the close of the state's proof, the state indicated that it had an election to read to the jury, (*id.* at 24:7–9; *id.* at 46–51), and the trial court held a jury-out hearing to discuss the evidence as it related to each count in the indictment, *State v. Sanders*, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545, at *8 (Tenn. Crim. App. Oct. 9, 2012); (Doc. No. 12-5 at 53–70). The trial court also ruled on Petitioner's motion for judgment of acquittal. (Doc. No. 12-5 at 55:6–9). Based on the evidence at trial, the state indicated that eight incidents of sexual abuse occurred at the residence on Apache Trail, (*id.* at 46–50; 51:1–5 (discussing counts one through eight)), and the remaining incidents occurred at Petitioner's residence on Linbar Drive, (*id.* at 51:6–23 (discussing counts nine and ten)). As to the motion for judgment of acquittal, the trial court granted Petitioner's

---

[4] The record shows that A.S. never received a medical examination to assess if she had sexual-abuse-related injuries. (Doc. No. 12-4 at 13:21).

motion to the extent that he moved for dismissal as to count two. *Sanders*, 2012 WL 4841545 at

*8; (*see* Doc. No. 12-5 at 62:7–9).[5]

The jury found Petitioner guilty as to all remaining counts in the indictment. *Sanders*, 2012

WL 4841545 at *8; (*see* Doc. No. 12-5 at 145–48).

3. Sentencing

The trial court held a sentencing hearing on March 23, 2011. (Doc. No. 12-6 at 1). Neither

the state nor Petitioner presented witnesses. However, the state's position was that the trial court

should apply enhancement factors one and fourteen under Tennessee Code Annotated § 40-35-

114. (*Id*. at 5).[6] In addition, the state, pursuant to Tennessee Code Annotated § 40-35-115(b)(5),

asked the trial court to run some or all of Petitioner's sentences consecutive, "one to the other."

(*Id*. at 9:13–17); *see Sanders*, 2012 WL 4841545 at *8.[7] The defense urged the trial court to

consider Petitioner's age, work history, and closeness with his family as mitigating factors. (Doc.

No. 12-6 at 9:19–25, 10:1–2). Based on these factors, the defense proposed "a sentence of fifteen

years with a sentence of eight years to run consecutive with the rest running concurrent." (*Id*. at

10:1–25, 11:1–9).

---

[5] Count two of the indictment alleged that Petitioner fondled the victim's breasts "while he was on top of her going back and forth." *Sanders*, 2012 WL 4841545 at *7. The state read the election as to the offense in count two as follows: the fondling occurred at the residence where the victim and Petitioner lived on Apache Trail. The victim was home with Petitioner at the time of the abuse, and the fondling occurred at night in the victim's bedroom. *See id*.; (*see also* Doc. No. 12-5 at 47:20–25, 48:1–6).

[6] Under enhancement factor one of Tennessee Code Annotated § 40-35-114, a court shall consider the defendant's previous history of criminal convictions or criminal behavior "to establish the appropriate range[.]" *Id*. § 40-35-114(1). Under enhancement factor fourteen, a court shall consider whether the defendant abused his position of public or private trust. *Id*. § 40-35-114(14).

[7] Tennessee Code Annotated § 40-35-115(b)(5) allows a trial court to run sentences consecutively if it finds, by a preponderance of the evidence, that "[t]he defendant [wa]s convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]" *Id*.

7

The Tennessee Court of Criminal Appeals ("TCCA"), on direct appeal from the trial court's judgment, summarized the trial court's findings at sentencing as follows:

> The [trial] court considered, on the record, the evidence presented at trial, the presentence report, the principles of sentencing, the nature and character of the criminal conduct, enhancing and mitigating factors, statistical information and appellant's statements.
>
> The trial court found enhancement factor number one, that appellant has a previous history of criminal behavior in addition to that necessary to establish the range of punishment, was proven by a preponderance of the evidence by the victim's testimony regarding uncharged conduct in the instant case. *See* Tenn. Code. Ann. § 40-35-114(1) (2006) . . . . The trial court found enhancement factor number fourteen, that appellant abused a position of public or private trust because he was in a position of step-father, as such. *See* Tenn. Code Ann. § 40-35-114(14). Even after appellant moved out of the home, he remained in a position of trust. The trial court gave little weight to factor number one but gave great weight to factor number fourteen. *Id*. § 40-35-114(1), (14). The court found no mitigating factors. Accordingly, the trial court sentenced appellant as a Range I standard offender to ten years each on Counts One, Three, Four, Five, and Six and twenty years each on Counts Seven, Eight, Nine, Ten.
>
> In determining concurrent versus consecutive sentences, the trial court considered Tennessee Code Annotated section 40-35-115(b)(5), which applies to offenses wherein appellant is convicted of two or more statutory offenses involving the sexual abuse of a minor, with consideration of the aggravating circumstances arising from the relationship between appellant and the victim, the timespan of undetected sexual activity, the nature and scope of the acts, and the extent of the residual physical and mental damage to the victim. The trial court found that the sexual activity went on for a period of time, that appellant held a close position of trust, and that the nature and scope of the acts were multiple. The trial court ordered the sentences for Counts One and Three to run consecutively to each other and Counts Four, Five, and Six to run concurrently with Counts One and Three. The sentences for all four counts of rape of a child were to run concurrently with each other but consecutive to Counts One and Three, for an effective forty-year sentence to be served at 100%.

*Sanders*, 2012 WL 4841545 at *8.

8

## B.    Direct Appeal

Petitioner, through counsel, appealed his convictions and sentence under Rule 3(b) of the Tennessee Rules of Appellate Procedure. Tenn. R. App. P. 3(b); (Doc. No. 12-8 at 5–40). He raised the following claims of trial error: the trial court erred when it (1) denied Petitioner's motion to suppress his statements to Ms. Standberry during the April 24, 2008 body-wire conversation; (2) denied Petitioner's motion for a judgment of acquittal because there was a material variance between the bill of particulars and the evidence presented at trial; and (3) imposed partial consecutive sentences. (Doc. No. 12-8 at 7). The TCCA, "[d]iscerning no error," affirmed the trial court's judgments. *Sanders*, 2012 WL 4841545 at *1.

The Tennessee Supreme Court ("TSC") granted Petitioner's application for permission to appeal "to address the legal standard courts should use to determine the admissibility of incriminating statements obtained by the parent of a" sexual abuse victim who is secretly cooperating with law enforcement. *State v. Sanders*, 452 S.W.3d 300, 302 (Tenn. 2014); (*see* Doc. No. 12-12). On November 10, 2014, it affirmed the lower courts' judgments. *Sanders*, 452 S.W.3d at 318.

## C.    Post-Conviction Proceeding

On July 6, 2015, Petitioner, proceeding *pro se*, timely filed a petition for post-conviction relief. (Doc. No. 12-16 at 51–71); *see* Tenn. Code. Ann. § 40-30-102(a) (providing that "a person in custody under a sentence of a court of this state must petition for post-conviction relief . . . within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken"). Petitioner twice amended his petition through court-appointed counsel. (Doc. No. 12-16 at 86–101, 105–07). As grounds for relief, Petitioner claimed that he received ineffective assistance of counsel because trial counsel failed to (1) obtain an expert witness on

9

false confessions; (2) object to Ms. Reilly's hearsay testimony; (3) investigate another adult male living with the victim; (4) cross examine the victim about the delay in her sexual-abuse disclosure or present this issue to the jury; (5) object to Ms. Gallion's expert testimony; (6) object to the state's closing argument; (7) interview Petitioner's ex-girlfriend Angela Roberts; (8) present witnesses at Petitioner's sentencing hearing; and (9) present certain arguments on direct appeal. *Sanders v. State*, No. M2019-00397-CCA-R3-PC, 2020 WL 2394992, at *3 (Tenn. Crim. App. May 12, 2020); (*see* Doc. 12-16 at 90–122).

After holding an evidentiary hearing, the post-conviction court denied Petitioner's petition for post-conviction relief. (Doc. No. 12-17 at 3–48). The TCCA affirmed the post-conviction court's judgment. *Sanders*, 2020 WL 2394992 at *1. On September 16, 2020, the TSC denied Petitioner's application for permission to appeal. (Doc. No. 12-30).

**D.      Federal Habeas Proceeding**

On January 13, 2021, Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 1). Petitioner raises eleven claims for relief. He argues that: (1) the trial court erred in denying his pre-trial motion to suppress, (Doc. No. 1 at 8 ("Ground 1")); (2) the trial court erred in denying his motion for judgment of acquittal, (*id*. at 14 ("Ground 2")); (3) the trial court erred in imposing partial consecutive sentences, (*id*. at 19 ("Ground 3")); (4) trial counsel was ineffective for failing to obtain and investigate an expert witness on false confessions, (*id*. at 22 ("Ground 4")); (5) trial counsel was ineffective for failing to object to the state's comments during closing arguments, (*id*. at 24 ("Ground 5")); (6) trial counsel was ineffective for failing to investigate the presence of another adult male living in the victim's home, (*id*. at 30 ("Ground 6")); (7) trial counsel was ineffective for failing to cross examine the victim about her disclosure or present this issue to the jury, (*id*. at 33 ("Ground 7")); (8) trial counsel was ineffective for failing

to object to and cross examine Ms. Gallion regarding her "expert opinions on physical diagnostic findings in child sexual abuse victims," (*id*. at 38 ("Ground 8")); (9) trial counsel was ineffective for failing to obtain a copy of the victim's forensic interview, (*id*. at 41("Ground 9")); (10) trial counsel failed to present character evidence and substantive evidence from Ms. Roberts, (*id*. at 52 ("Ground 10")); and (11) the "cumulative performance of trial counsel" was deficient and prejudicial (*id*. at 55 ("Ground 11")). Respondent has filed an Answer to the Petition. (Doc. No. 13).

## II.     STANDARDS OF REVIEW

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which allows a federal court to grant a writ of habeas corpus to a state prisoner who "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The AEDPA applies to petitions that a state prisoner files after April 24, 1996—the AEDPA's effective date. *Woodford v. Garceau*, 538 U.S. 202, 204, 207 (2003) ("[A]n application filed after AEDPA's effective date should be reviewed under AEDPA[.]"). Because Petitioner filed his petition for a writ of habeas corpus in this Court well after the AEDPA's effective date (*see* Doc. No. 1), the AEDPA governs his Petition. *See Haliym v. Mitchell*, 492 F.3d 680, 689–90 (6th Cir. 2007) ("Because this case involves a petition for habeas corpus filed after the effective date of the Antiterrorism Death Penalty Act . . . AEDPA governs this Court's review." (citation omitted); *Powers v. Wingard*, 3 F. App'x 290, 292 (6th Cir. 2001) ("[T]he AEDPA applies to this case because Powers filed his petition for a writ of habeas corpus after the Act's effective date of April 24, 1996." (citations omitted). As discussed in more detail below, the AEDPA restricts a federal court's authority to grant a writ of habeas corpus to a state prisoner. *See* 28 U.S.C. § 2254(b)(1)(A) (explaining that "[a]n application for a writ of habeas corpus . . . shall not be granted" unless "the

11

applicant has exhausted the remedies available in the courts of the State"); *see also Williams v. Taylor*, 529 U.S. 362, 398–99 (2000) (describing 28 U.S.C. § 2254(*d*)(1) under the AEDPA, which governs "claims adjudicated on the merits[,]" as "a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners").

### A.    Exhaustion

Before a federal court can grant an application for a writ of habeas corpus under 28 U.S.C. § 2254, a state prisoner "must [first] exhaust his remedies in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]"). The exhaustion requirement, grounded in principles of comity, ensures that the state courts have the first opportunity to consider a constitutional violation before a habeas petitioner presents it to a federal court. *O'Sullivan*, 526 U.S. at 845 ("This rule of comity reduces friction between the state and federal court systems by avoiding the unseem[liness] of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." (internal quotation marks and citations omitted)).

Accordingly, a habeas petitioner must preserve a constitutional claim for federal habeas review by "fairly present[ing]" it to the state courts. *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (internal quotation marks and citation omitted). A constitutional claim is fairly presented when "the petitioner asserted both a factual and legal basis for his claim in state court." *Id.* (internal quotation marks and citation omitted). In addition, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. In Tennessee, presentation of

12

a federal claim to the TCCA—the state's intermediate appellate court—is sufficient to deem the claim exhausted under state law. *See* Tenn. S. Ct. R. 39 ("[A] claim presented to the Court of Criminal Appeals shall be considered exhausted even when such claim is not renewed in the Supreme Court on automatic review."); *see also Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (noting that "Rule 39 clearly removed Tennessee Supreme Court review as an antecedent for habeas purposes").

## B.    Adjudicated Claims

The AEDPA also limits a federal court's authority "to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams*, 529 U.S. at 412. A federal court may issue a writ only if a state prisoner can show that the state court's adjudication of a claim resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence in the State court proceeding." 28 U.S.C. §§ 2254(d)(1), (2).

The phrases "contrary to" and "unreasonable application" under § 2254(d)(1) have different meanings. *Williams*, 529 U.S. at 365. "Contrary to" means "'diametrically different,' 'opposite in character or nature,' or mutually opposed.'" *Id*. at 405 (quoting Webster's Third New Int'l Dictionary 495 (1976)). A state court decision will be "contrary to" clearly established law in two scenarios. *Id*. In the first scenario, a state court decision is contrary to clearly established law if it applies "a rule that contradicts the governing law set forth in" Supreme Court cases. *Id*.: *see Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (explaining that clearly established law under § 2254(d)(1) "'refers to holdings, as opposed to the dicta, of this Court's decision as of the time of the relevant state-court decision'" (quoting *Williams*, 529 U.S. at 412)). In the second

13

scenario, a state-court decision is contrary to Supreme Court precedent if it "confronts a set of facts that are materially indistinguishable from a decision of th[at] Court and nevertheless arrives at a result different from [] its precedent." *Williams*, 529 U.S. at 405. A state court's failure to cite Supreme Court authority, however, does not necessarily mean that the state court's decision is "contrary to" clearly established federal law, "so long as neither the reasoning nor the result of the state-court decision contradicts" Supreme Court precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002). In addition, "while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citations omitted).

A state court decision is unreasonable under § 2254(d)(1) when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case[.]" *Williams*, 529 U.S. at 407–08. "[A] federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable." *Id.* at 410 (emphasis added) (internal quotation marks omitted).

The standards under § 2254(d)(1) are highly deferential to a state court's rulings and "require[] heightened respect for state court . . . legal determinations." *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998); *see Renico v. Lett*, 559 U.S. 766, 777 (2010) ("AEDPA thus imposes a highly deferential standard for evaluating state-court rulings . . . and demands that state-court decisions be given the benefit of the doubt." (internal quotation marks and citations omitted)). In line with AEDPA deference, a federal court cannot issue a writ "simply because it concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 365. As a condition for relief under § 2254(d),

14

"a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The AEDPA, under § 2254(d)(2), likewise imposes a highly deferential standard for reviewing a state court's factual determinations. *Burt v. Titlow,* 571 U.S. 12, 18–19 (2013). A state court's factual determinations are presumed correct, and a habeas petitioner "has the burden of rebutting the presumption of correctness by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338–39 (2013) (quoting 28 U.S.C. § 2254(e)(1)). A state court's factual findings are not unreasonable under § 2254(d)(2) simply because the federal court "would have reached a different conclusion." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (citations omitted); *see id*. ("[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" (citation omitted)). A federal habeas court is limited to reviewing "the evidence presented in the State Court proceeding." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III. DISCUSSION

The Court will address Petitioner's claims in the order that he raises them in his Petition. In doing so, it will first consider Petitioner's three claims of trial error, then his seven claims of ineffective assistance of counsel, and lastly, his cumulative-error claim.

### A. Claims of Trial Error – Grounds 1 through 3

1. Ground 1: Motion to Suppress

In Ground 1 of his Petition, Petitioner argues that the trial court erred when it denied his pre-trial motion to suppress his statements to Ms. Standberry. (Doc. No. 1 at 8). In support of this claim, Petitioner insists that his statements to Ms. Standberry, which he asserts she surreptitiously

recorded "at the behest of the police," were coerced because she "continued to push for a confession using threats . . . 'infamy' and promises" even though he "repeatedly denied wrongdoing." (*Id.* at 8, 10–11 (claiming that Ms. Standberry told him she "would prosecute if he did not confess" and that "she had the power to prevent him from being prosecuted")). Petitioner claims error of constitutional dimension, stating that his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution "were violated." (*Id.* at 12).

a. Fourth Amendment Claim

The Fourth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, assures the "right of the people to be secure in their persons, houses, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.; *see Albright v. Oliver*, 510 U.S. 266, 315 n.35 (1994). The Fourth Amendment's exclusionary rule, judicially created, safeguards an individual's Fourth Amendment rights because it precludes the admission of unlawfully obtained evidence through its deterrent effect of police misconduct. *United States v. Leon*, 468 U.S. 897, 906, 909 (1984).

Respondent, in its Answer, responds to Petitioner's Fourth Amendment claim in two ways. First, Respondent raises the issue of procedural default. (*See* Doc. No. 13 at 36 ("To the extent the petition may be construed to raise a claim beyond that asserted in the direct appeal, such a claim would be procedurally defaulted.")). Second, Respondent argues that Petitioner's Fourth Amendment claim is not cognizable pursuant to *Stone v. Powell*, 428 U.S. 465 (1976) and *Good v. Berghuis*, 729 F.3d 636 (6th Cir. 2013). (*Id.*)

i. Procedural Default

The doctrine of procedural default, like exhaustion, is grounded in principles of comity. *See Shinn v. Ramirez*, 596 U.S. 366, 378 (2022) ("Together, exhaustion and procedural default

16

promote federal-state comity."). Procedural default protects against "'the significant harm to the States that results from the failure of federal courts to respect' state procedural rules." *Id*. at 378–79 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Exhaustion, on the other hand, "serves to minimize friction between our federal and state systems . . . by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (citation omitted).

Procedural default and exhaustion, however, are "distinct concepts." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). The exhaustion requirement under the AEDPA "only 'refers to remedies still available at the time of the federal petition[,]'" regardless of the reason for their unavailability. *Id*. (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.8 (2006)). So, if a petitioner "failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted[.]" *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Exhaustion, however, in this scenario, does not automatically entitle the petitioner to litigate his or her claims in federal court; instead, the petitioner has procedurally defaulted the claim and is barred from review under § 2254. *Id*.; *see Anderson*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review." (citation omitted)).

As already stated, in Tennessee, a petitioner is "'deemed to have exhausted all available state remedies for [a] claim'" when it is fairly presented to the TCCA. *Adams*, 330 F.3d at 401 (quoting Tenn. Sup. Ct. R. 39). Here, Petitioner, on direct appeal to the TCCA, referenced the Fourth Amendment, albeit in a single sentence, in his appellate brief, but the TCCA did not analyze a Fourth Amendment claim based on an unreasonable search and seizure. (Doc. No. 12-8 at 22 (claiming that his "right to due process of law and against self incrimination under the *Fourth*,

17

Fifth, and Fourteenth amendments to the Constitution and Article I, section 9 of the Tennessee Constitution" (emphasis added)); *see Sanders*, 2012 WL 4841545 at \*1–17. [8] Whether Petitioner "fairly presented" a Fourth Amendment claim on direct appeal to the TCCA, therefore, merits further discussion; if he failed to do so, he has procedurally defaulted this claim because no further avenue exists for him to present it in state court. *See* Tenn. R. App. P. 4(a) (establishing thirty-day deadline for filing an appeal, which runs from the date of entry of conviction) *see also* Tenn. Code Ann. § 40-30-102(c) (prohibiting the filing of more than one petition for post-conviction relief attacking a single judgment).

A claim is "fairly presented" if the petitioner asserted both the factual and legal basis for his claim to the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2002). A petitioner need not either cite "book and verse on the federal constitution," *Picard v. Connor*, 404 U.S. 270, 279 (1971) (internal quotation marks and citations omitted), or "specify a precise constitutional amendment by number in his state brief," as long as "he did specify, in substance, the right afforded by the Constitution which he claimed had been violated," *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984). A petitioner, on the other hand, does not fairly present the substance of a constitutional claim with generalized, catch-all phrases. *See, e.g.*, *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (concluding that the petitioner did not fairly present his claim when his reference to federal law in his state-court brief was a "bare and isolated citation to the Fourteenth and Sixth Amendments"); *Blackmon v. Booker*, 394 F.3d 399, 401 (6th Cir. 2004) (failing to develop "any cogent arguments regarding those [fair-trial and due-process] rights beyond the naked assertion that they were violated" is insufficient); *Franklin v. Rose*, 811 F.2d 322, 323, 325

---

[8]     The Court notes that Petitioner did not raise a Fourth Amendment claim in his petition for post-conviction relief either. *See Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) ("Claims not exhausted on direct appeal may be exhausted through a properly raised and appealed application for state postconviction relief.").

18

(6th Cir. 1987) (determining that the petitioner's claim that he was "effectively denied . . . of his right to a fair trial as guaranteed to him under the United States Constitution and the Constitution of the State of Tennessee" was not a fair presentation of the substance of his claim). In addition, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts . . . or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted). A petitioner, rather, must bring to the state court's attention the constitutional claim found inherent in those facts. *Picard*, 404 U.S. at 277.

At bottom, "[d]etermining when a claim has been 'fairly presented' is contextual and individual to each case." *Houston v. Waller*, 420 F. App'x 501, 509 (6th Cir. 2011); *see, e.g.*, *Blackmon*, 394 U.S. at 400–01 (considering the frequency in citations to federal authority in state briefs); *Picard*, 404 U.S. at 278 (considering whether the substance of the federal habeas corpus claim is "the substantial equivalent" of the claim raised in state court). The Sixth Circuit has identified four factors for courts to consider when determining whether a petitioner has fairly presented a claim to the state courts: (1) reliance upon federal cases employing constitutional analysis; (2) reliance on state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *Franklin*, 811 F.2d at 326.

On direct appeal to the TCCA, Petitioner, in claim one of his appellate brief, asserted that the trial court erred in denying his motion to suppress his statements to Ms. Standberry. (Doc. No. 12-8, at 22). Petitioner explained that he "argued [before the trial court] that Standberry and the police violated his right to due process of law and against self-incrimination under the *Fourth*, *Fifth*, and Fourteenth Amendments to the United States Constitution and Article 1, section 9 of the

19

Tennessee Constitution." (*Id.* (emphasis added)). His appellate brief further reads, "In said motion [to suppress], the defendant argued that Standberry was acting as a government agent when she engaged in the conversation with the defendant, and that the defendant's statement was the product of coercion." (*Id.*) Petitioner renewed this argument before the TCCA as follows: "Because Standberry acted as an agent or instrument to the state and obtained his statements through coercion, his constitutional rights to due process and self-incrimination were violated." (*Id.* at 23).

Considering the factors in *Franklin* and based on the Court's review of Petitioner's appellate brief, Petitioner did not fairly present the substance of his Fourth Amendment claim to the TCCA. First, the state-court opinions that Petitioner cited did not employ any federal constitutional analysis within the context of unlawful searches and seizures. *See Franklin*, 811 F.2d at 326 (considering reliance on state cases employing constitutional analysis in like situations); (*see also* Doc. No. 12-8 at 21–29 (citing *State v. Womack*, No. E2003-02332-CCA-R3-CD, 2005 WL17428, at *6 (Tenn. Crim. App. Jan. 4, 2005); *State v. Phillips*, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000); *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994); *State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980)). Instead, the state courts employed a constitutional analysis under Article I, § 9 of the Tennessee Constitution, the *Fifth* Amendment to the United States Constitution, or both. *See Womack*, 2005 WL17428 at *3–4 (referring to "[t]he test for voluntariness under the Tennessee Constitution" when determining whether trial court erred in admitting defendant's statements at trial); *Phillips*, 30 S.W.3d at 374 (same); *Stephenson*, 878 S.W.2d at 542 (claiming that the trial court erred in failing to suppress capital defendants confession, in violation of the both Article I, § 9 of the Tennessee Constitution and the Fifth Amendment of the United States Constitution). Petitioner also relied on *Kelly*, a TSC opinion, as setting forth the proper inquiry for determining the voluntariness of a suspect's confession. (Doc.

20

No. 12-8 at 26). But like the other state-court opinions Petitioner relied on, the TSC in *Kelly* did not employ a constitutional analysis under the Fourth Amendment either. 603 S.W.2d at 726–30. The TSC in *Kelly* considered the voluntariness and admissibility of a defendant's confession under the Fifth Amendment and Fourteenth Amendment. *Id*.

Second, although Petitioner did cite federal cases in his appellate brief—two opinions from the United States Supreme Court—the Supreme Court did not employ a constitutional analysis under the Fourth Amendment. (Doc. No. 12-8 at 26 (citing *Bram v. United States*, 168 U.S. 532, 542–43 (1897); *Rogers v. Richmond*, 365 U.S. 535, 540 (1961)); *see Franklin*, 811 F.2d at 326 (considering the petitioner's "reliance on pertinent federal cases employing constitutional analysis"). Petitioner, for instance, cited *Rogers* and *Bram* in support of his position that Ms. Standberry obtained his statements through coercion. (Doc. No. 12-8 at 26). The Supreme Court in *Rogers* considered the appropriate test of admissibility of confessions under the Fourteenth Amendment to the United States Constitution. 365 U.S. at 540–41 (considering whether the state court "failed to apply the standard demanded by the Due Process Clause of the Fourteenth Amendment for determining the admissibility of a confession"). The Court in *Bram*, similarly, considered the voluntariness of a criminal defendant's confession but within the context of the Fifth Amendment. 169 U.S. at 542–43 (explaining that "wherever a question arises whether a confession is . . . not voluntary, the issue is controlled by . . . the fifth amendment to the [United States] constitution").

As to the last two factors under *Franklin*, Petitioner neither phrased a "claim in terms sufficiently particular to allege a denial of" his rights under the Fourth Amendment nor did he allege facts "well within the mainstream of" a Fourth Amendment claim on appeal to the TCCA. *Whiting v. Burt*, 395 F.3d 602, 613 (6th Cir. 2005) (citing *Franklin*, 811 F.2d at 326). The Sixth

21

Circuit, in addressing these two factors, has considered whether the state courts have treated a petitioner's phrasing of a fact pattern "as appropriate for constitutional analysis." *Houston*, 420 F. App'x at 511 (internal quotation marks and citation omitted).

Tennessee courts have recognized that "[t]he interception of a conversation in which a person has a reasonable expectation of privacy constitutes a search within the meaning of the Fourth Amendment." *State v. Hill*, 333 S.W.3d 106, 125 (Tenn. Crim. App. 2010) (citing *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001); *see Munn*, 56 S.W.3d at 494 (stating that the "interception of a conversation in which a person has a reasonable expectation of privacy constitutes a search within the meaning of the Fourth Amendment" (citing *Katz v. United States*, 389 U.S. 347, 353 (1967))). It has further recognized, in line with Supreme-Court jurisprudence, that the "'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person . . . has a legitimate expectation of privacy in the invaded place.'" *State v. Willis*, 496 S.W.3d 653, 719 (Tenn. 2016) (quoting *Rakas v. Ill.*, 439 U.S. 128, 143 (1978)). In this vein, when considering a Fourth Amendment claim, they have applied the following two-part inquiry: whether (1) the individual had an actual, subjective expectation of privacy and (2) society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances. *Munn*, 56 S.W.3d at 494.

But Petitioner, in his appellate brief, neither set forth any fact pattern that law enforcement's interception of his body-wire conversation with Ms. Standberry was an unlawful search or seizure, nor did he allege facts that would suggest he had a reasonable expectation of privacy in his conversation with Ms. Standberry that would have alerted the TCCA that he was raising a Fourth Amendment claim. *See Hill*, 333 S.W.3d at 125. Accordingly, the substance of Petitioner's arguments focused, not on the basis that his statements to Ms. Standberry were

22

inadmissible because they were the product of an unlawful search and seizure under the Fourth Amendment; instead, they focused on the basis that his statements were inadmissible because they were coerced, in line with the Fifth Amendment's constitutional protection against self-incrimination and "the broader guarantees" under the Fourteenth Amendment's Due Process Clause. *Chavez v. Martinez*, 538 U.S. 760, 7956 (2003); *see Brown v. Ill.*, 422 U.S. 590, 601 (1975) (explaining that the exclusionary rule, "when utilized to effectuate the Fourth Amendment, serves interests and policies *distinct* from those it serves under the Fifth" (emphasis added)); (*see also* Doc. No. 12-8 at 26 (claiming that his statements to Ms. Standberry were obtained through coercion)).

Based on the foregoing, Petitioner did not sufficiently alert the TCCA to his Fourth Amendment claim, and his mere reference to a Fourth Amendment violation in his appellate brief did not afford the TCCA adequate notice of this claim. *Cf. Slaughter*, 450 F.3d at 236 (concluding that the petitioner's "bare and isolated citation to the Fourteenth and Sixth Amendments" was insufficient to fairly present his federal claim to state courts). Petitioner also no longer has an available avenue for presenting his claim in state court because he is barred from raising it under Tennessee Rule of Appellate Procedure 4 and Tennessee Code Annotated § 40-30-102(c). Tenn. R. App. P. 4(a) (establishing thirty-day deadline for filing appeal as of right, which runs from the date of entry of conviction); Tenn. Code Ann. § 40-30-102(c) (prohibiting the filing of more than one petition for post-conviction relief attacking a single judgment); *see Poston v. Settles*, No. 2:18-cv-00049, 2019 WL 1958389, at *16 (M.D. Tenn. May 2, 2019) ("The claim is now barred from presentation to the state courts by Tennessee Rule of Appellate Procedure 4 . . . and the 'one petition' limitation of § 40-30-102(c)."). To the extent, therefore, that Petitioner raises a Fourth Amendment claim in his Petition, he has procedurally defaulted this claim. He also makes no

23

attempt to hurdle this procedural barrier through a showing of cause and prejudice or a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750 ("[F]ederal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.").

ii. *Stone* Doctrine

In the alternative, even if Petitioner fairly presented the substance of his Fourth Amendment claim to the TCCA, and he seeks habeas review here as to this claim, it is not cognizable under *Stone*. In *Stone*, the United States Supreme Court weighed the utility of applying the Fourth Amendment's exclusionary rule against the "costs" of extending it in federal habeas corpus proceedings. 428 U.S. at 491. It prefaced its discussion with an explanation of the "well known" costs of applying it at trial and on direct review:

> [T]he focus of the trial, and the attention of the participants therein, are diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Moreover, the physical evidence sought to be excluded [under the exclusionary rule] is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant . . . . Application of the rule thus deflects the truthfinding process and often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the [exclusionary] rule is contrary to the idea of proportionality that is essential to the concept of justice.

*Id*. at 490–91. The *Powell* Court recognized that these "long-recognized costs of the rule persist when a criminal conviction is sought to be overturned on collateral review on the ground that a search-and-seizure claim was erroneously rejected by two or more tiers of state courts." *Id*. at 491.

The *Powell* Court further explained that the primary purpose for the exclusionary rule is to deter unlawful police misconduct, not "to redress the injury to the privacy of the victim of the

search and seizure." *Id*. at 486. Accordingly, its deterrent effect within the context of a federal habeas proceeding—the key purpose of which is to free innocent persons—"is small in relation to the costs." *Powell*, 428 U.S. at 491; *see id*. at 493 (stating that "[t]he view that the deterrence of Fourth Amendment violations would be furthered [on federal habeas corpus review] rests on the dubious assumption that law enforcement authorities would fear that federal habeas review might reveal flaws in a search or seizure that went undetected at trial and on appeal"). As the Sixth Circuit similarly recognized in *Berghuis*, "[a]ny deterrence produced by an additional layer of habeas review is small, but the cost of undoing final convictions is great." 729 F.3d at 637 (citing *id*. at 493). For these reasons, the exclusionary rule has "minimal utility . . . when sought to be applied to Fourth Amendment claims in a habeas corpus proceeding." *Powell*, 428 U.S. at 542 n.37.

Federal habeas review, therefore, is unavailable to a petitioner claiming that his conviction rests on evidence seized in violation of the Fourth Amendment if "he has previously been afforded an opportunity for full and fair litigation of his claim in the state courts." *Id*. at 469; *see, e.g.*, *Griffin v. Rose*, 546 F. Supp. 932, 935 (E.D. Tenn. 1981) (determining that the petitioner was afforded full and fair opportunity to litigate his claim in the state courts when the trial court held a hearing on his pre-trial motion to suppress, he raised his claim in both state appellate courts, and they fully considered his claim). Whether a petitioner had an opportunity for full and fair litigation is a two-part inquiry. *Riley v. Gray*, 674 F.2d 522, 525 (6th Cir. 1982). First, a district court must determine whether the state procedural mechanism, "in the abstract, presents the opportunity to raise a fourth amendment claim." *Id*. (citation omitted). Second, a district court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism. *Id*. at 526. In *Berghuis*, the Sixth Circuit clarified the meaning of *Powell*'s opportunity for full and fair consideration: "opportunity for full and fair consideration means an available avenue for the

25

prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." 729 F.3d at 639 (internal quotation marks omitted). Accordingly, it emphasized that the focus is "on the *opportunity* for fair consideration presented by the state courts, not the procedure used in a given case to address the specific argument of a given defendant." *Id.* (emphasis in original).

Petitioner had available avenues to present his Fourth Amendment claim to the state courts. The first available avenue is under Rule 12 of the Tennessee Rules of Criminal Procedure, which allows a criminal defendant to file a pretrial motion to suppress the evidence. Tenn. R. Crim. P. 12(b)(2)(C) (providing that a motion to suppress evidence must be made before trial). The second available remedy is under Tennessee's rules of appellate procedure, which allow a criminal defendant to appeal the trial court's adverse ruling on a motion to suppress, as well as his conviction, before the TSC or TCCA. Tenn. R. App. P. 3(b) (allowing an appeal as of right "from any judgment of conviction entered by a trial court" in a criminal action).

The record shows that Petitioner availed himself of the former remedy but not the latter. For instance, he filed a pretrial motion to suppress his statements to Ms. Standberry during the April 24, 2008 body-wire conversation. (Doc. No. 12-1 at 16–21). Petitioner, however, for reasons he does not explain, did not avail himself of the second remedy because, for the reasons this Court explained in the previous section, he did not raise a Fourth Amendment claim in his brief on direct appeal to the TCCA. (*See* Doc. No. 12-8).[9] His failure to avail himself of this remedy, however,

---

[9]    The TSC, on direct review, observed that Petitioner, in his motion to suppress, argued that Ms. Standberry's recorded interrogation qualified as an unreasonable search and seizure in violation of his rights under the Fourth Amendment but that Petitioner "later abandoned this argument." *Sanders*, 452 S.W.3d at 318 n.3. It therefore deemed his Fourth Amendment claim "waived." *Id*. This Court has recognized that a state appellate court's "application of its waiver-rule" frustrates a petitioner's opportunity to litigate a claim for purpose of precluding *Stone*, but not if the state court's application of that rule is "entirely legitimate." *Gray*, 627 F. Supp. at 12 ("Although [the petitioner]'s opportunity to litigate the merits of his Fourth-Amendment claim was frustrated by that Court's application of its waiver-rule, such was entirely legitimate.

26

does not mean that the state courts deprived him of a full and fair opportunity to present it for purposes of precluding *Stone*. *See Gray v. Rose*, 627 F. Supp. 7, 11 (M.D. Tenn. 1985) (stating that "[a]ctual litigation of the claim in the state courts is not required" and does not preclude *Stone*'s application) (citing *Boyd v. Mintz*, 631 F.2d 247, 250–51 (3d Cir. 1980))). As this Court has explained, "[t]he state need only have provided an *opportunity* for the full and fair litigation of the Fourth-Amendment issue, irrespective of whether the petitioner took advantage of that opportunity." *Gray*, 627 F. Supp. at 11 (citation omitted); *cf. Turentine v. Miller*, 80 F.3d 222, 225 (7th Cir. 1996) ("It seems clear that Turentine [the petitioner] had a full and fair opportunity to present his *Payton* argument to the Indiana Court of Appeals, but for whatever reason he did not take advantage of it."). And Petitioner otherwise fails to describe how these avenues frustrated his presentation of his Fourth Amendment claim or, in other words, "that there was a failure of th[ese] state procedural mechanism[s]." *James v. Parish*, 652 F. Supp. 3d 903, 909 (E.D. Mich. 2023) ("Petitioner must show that he was prevented from litigating the Fourth Amendment issue by a failure of Michigan's procedural mechanism.").

---

The frustration was not the product of any unreasonable or unjustified conduct on the part of the state-Court, but resulted from the fault of the petitioner who (through his counsel) did not abide by that Court's reasonable rule regarding the briefing of issues he had chosen to raise."). For the reasons the Court previously explained in this Memorandum Opinion, Petitioner did not a raise a Fourth Amendment claim in his brief on direct appeal to the TCCA, and therefore, the TSC's determination that his Fourth Amendment claim was "waived" was legitimate. *Sanders*, 452 S.W.3d at 318 n.3; *see Hodge v. Craig*, 382 S.W.3d 325, 348 n.3 (Tenn. 2012) ("Issues not raised in the trial court or in the intermediate appellate courts may be deemed waived when presented to this Court." (citations omitted)); *see also Gray*, 627 F. Supp. at 12 (concluding that, although the petitioner's "opportunity to litigate the merits of his Fourth-Amendment claim in the state appellate-Court was frustrated by that Court's application of its waiver-rule, such was entirely legitimate" (citing *Riley*, 674 F.2d at 526 n.3)). And Petitioner, otherwise, fails to explain how the TSC's application of its waiver rule was "the product of any unreasonable or unjustified conduct" that may preclude *Stone*'s application. *Gray*, 627 F. Supp. at 11.

For these reasons, Petitioner's claim that his Fourth Amendment rights "were violated" is barred under *Stone*. (Doc. No. 1 at 12).[10]

  b.  Fourteenth and Fifth Amendment Claims

Petitioner also claims that his Fourteenth and Fifth Amendment rights "were violated" when the trial court denied his motion to suppress. (Doc. No. 1 at 12). In support of this claim, Petitioner argues that Ms. Standberry "psychologically coerced" him "into stating that he sexually touched" A.S. (Doc. No. 1 at 8, 11). According to Petitioner, Ms. Standberry psychologically coerced him into confessing because she "demanded a confession five (5) times" and "continued to push for a confession using threats" and "infamy," despite that he denied criminal activity more than fifty times. (*Id*. at 11–12). He, specifically, points to Ms. Standberry's statement during the body-wire conversation in which she told Petitioner that she had "the power to stop this thing." (*Id*. at 11).

The record shows, and Respondent does not dispute, that Petitioner exhausted this claim because he raised it on direct appeal to the TCCA. He also renewed it before the TSC. (Doc. No. 12-13 at 12 (arguing that Petitioner's statements were coerced because he "denied criminal activity more than fifty (50) times during the secretly recorded conversation[,]" and Ms. Standberry "specifically demanded a confession" numerous times)). Both appellate courts rejected it on the merits, and the Court therefore must analyze this claim under the AEDPA's highly deferential

---

[10]  Even if *Stone* does not apply, Petitioner's Fourth Amendment claim fails on the merits. The Supreme Court has held that the Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa v. United States*, 385 U.S. 293, 302 (1996); *see United States v. White*, 401 U.S. 745, 751 (1971) (recognizing that, in light of its holding in *Hoffa*, "[n]o warrant to 'search and seize' is required in such circumstances"); *see also id*. at 752 ("If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case." (citation omitted)). In light of this caselaw, the Fourth Amendment does not protect Petitioner's "misplaced confidence" that Ms. Standberry "would not reveal his wrongdoing." *Hoffa*, 385 U.S. at 302.

standard of review. *See Stermer v. Warren*, 959 F.3d 704, 727 (6th Cir. 2020) (explaining that whether the state court decided a petitioner's claim on the merits "was critical because[,]" if so, "AEDPA's high standard of review is triggered"). Accordingly, Petitioner is only entitled to relief if he can show the state court's last reasoned decision, *i.e.*, the TSC, was "contrary to, or involved an unreasonable application of, clearly established Federal law," or "resulted in a decision that was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d); *see Taylor v. Simpson*, 972 F.3d 776, 783 (6th Cir. 2020) ("Under AEDPA, the federal habeas court may overturn a state court conviction if the state court's last reasoned decision that adjudicated the challenged issue on the merits 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,] or [ ] resulted in a decision that was based on an unreasonable determination of the facts.'" (quoting 28 U.S.C. § 2254(d)).

   i.   State Courts' Rulings

The Court will begin its analysis with a summary of the evidence from the hearing on Petitioner's pre-trial motion to suppress and the state courts' rulings. The TCCA summarized the evidence from Petitioner's hearing on his pre-trial motion to suppress as follows:

> [Ms. Standberry] did not want to believe that the father of her son had committed such acts against her daughter. As Ms. Standberry learned more of the details, she became bitter. She acknowledged during direct examination that she had an interest in speaking with appellant to hear his side of the matter.
>
> At some point after police were notified and after the victim's forensic interview, Detective [ ] Mayo . . . asked Ms. Standberry if she would be willing to engage appellant in a recorded conversation. She agreed to assist police but said she would have wanted to have the conversation with appellant to obtain closure regardless of being asked by police. The conversation occurred one afternoon when appellant picked up their son and drove him to Ms. Standberry's house. Appellant was waiting on her when she arrived at her home. She initiated the conversation as they were standing in her driveway close to his vehicle. Detective Mayo and two other detectives were nearby monitoring the conversation.

29

During her conversation with appellant, police telephoned Ms. Standberry approximately three times to offer suggestions of how she should ask questions to obtain a detailed statement from appellant. Police specifically wanted appellant to admit to "penetration," so they suggested other ways for Ms. Standberry to ask the question. The conversation lasted for more than an hour and a half.

On cross-examination, Ms. Standberry admitted that police wanted her to engage appellant in a recorded conversation because they wanted to obtain a confession. She acknowledged that her intent was also to obtain a confession from appellant when she agreed to wear a body wire.

Ms. Standberry admitted telling appellant that they could work out the problem between the two of them if he admitted what he had done, that if he confessed, the police would not have to be involved, that he had the power to stop the situation, that the case would be over if the victim did not show up for her forensic interview, and that she did not want the situation to go any further. She also admitted telling appellant that if he left the matter with her, she would have no choice but to pursue it. She also told him that when the victim went to the forensic interview, everything would come out. Ms. Standberry stated that her purpose in lying to appellant was to obtain a confession. She said, "[I]f it means that I had to fabricate in some way, then whatever I had to do to try to get the truth . . . ."

Detective Mayo testified that he was involved in the investigation of appellant's case. During the investigation, Detective Mayo asked Ms. Standberry to wear a body wire to record a conversation with appellant. Based on his experience, the accused in cases such as this are not usually truthful with police but are often willing to talk about the facts with family members or friends. He contacted Ms. Standberry within one month of initiating the investigation. Detective Mayo testified that Ms. Standberry was willing to assist him. In giving her instructions, he told her to speak with appellant about the allegations and ask him what occurred. He did not specifically instruct her to lie to appellant.

Detective Mayo stated that nothing in the surroundings or environment in which the conversation occurred would have prevented appellant from ending the conversation at any time. Appellant never attempted to end the conversation. Detective Mayo testified that he called Ms. Standberry three to five times to offer encouragement and to suggest specific questions to ask appellant.

At some point in the conversation, appellant admitted to inadvertent sexual contact with the victim. Detective Mayo subsequently interviewed appellant, but appellant made no confessions at that time. He maintained his innocence.

*Sanders*, 2012 WL 4841545 at *2–3.

The trial court, in its December 15, 2010 order, denied Petitioner's motion to suppress. (Doc. No. 12-1 at 111–19). Before addressing the voluntariness of Petitioner's confessions, it first considered the threshold issue of whether Ms. Standberry acted as a government agent. (*Id*. at 116).[11] In deciding this issue, it applied the TSC's legal framework in *State v. Burroughs*, 926 S.W.2d 243, 246 (Tenn. 1996) "as guidance" and concluded that Ms. Standberry did not act as a government agent because she had "an independent motivation to participate in the body wire" conversation. (*Id*. at 117). In light of this finding, the trial court stated that it did not need to address

---

[11]    The Court notes that Petitioner devoted substantial portions of his pretrial motion to suppress and appellate briefs to arguing that Ms. Standberry acted as a government agent for Fifth Amendment purposes. (Doc. No. 12-1 at 18–20 (pretrial motion to suppress); Doc. No. 12-8 at 23–24 (TCCA Brief); Doc. No. 12-11 at 14–18 (TSC brief)). He relied on the TSC's opinion in *Burroughs* in support of his position. (*See id*.) In *Burroughs* the TSC determined "how and when private conduct in th[e] [*Fourth Amendment*] context is chargeable to the state"—an issue, it recognized, "ha[d] been litigated with mixed results." 926 S.W.2d at 245. In its analysis, it explained that although the Fourth Amendment limits only governmental activity, it recognized that a private individual's search, in line with the United Supreme Court's decision in *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971), "may transgress the protections of the Fourth and Fourteenth Amendments when an individual acts as an agent or instrument of the state." *Id*. Considering *Coolidge*, the TSC observed that federal courts began developing criteria for determining the point at which a private individual becomes a state agent, "imputing, thereby, violations of the Fourth Amendment to the state." *Id*. It adopted the "legitimate independent motivation" test announced in *United States v. Howard*, 752 F.2d 220 (6th Cir. 1985) to determine whether a party acts as an instrument or agent of the state for Fourth Amendment purposes. *Id*. at 245–46. Under this two-part test, courts consider: (1) the government's knowledge and acquiescence in the search, and (2) the party's intent when performing the search. *Id*. at 246. At the time of Petitioner's direct appeal to the TCCA, however, the state courts grappled with whether the *Burroughs* test should apply in the "context of a *Fifth Amendment* voluntariness challenge" as well. *State v. Ackerman*, 397 S.W.3d 617, 645 (Tenn. Crim. App. 2012) (emphasis added). Accordingly, the TSC, on direct appeal, considered "what role, if any, the 'legitimate independent motivation' test [it] . . . adopted in *State v. Burroughs* and that the" TCCA employed in *Ackerman*, "should have in the adjudication of an involuntary confession claim." *Sanders*, 452 S.W.3d at 306; (*see* Doc. No. 12-12). Because the TSC determined that "the constitutional right against unreasonable searches and seizures is substantively different from the constitutional right against compulsory self-incrimination," it did not find the "legitimate independent motivation" test it announced in *Burroughs* appropriate in the Fifth Amendment context. *Id*. at 311.

31

"the second issue"—that is, whether Petitioner's confession was coerced. (*Id*. at 117). The trial court nonetheless observed that "there [wa]s no evidence that [Petitioner]'s will was overborne and that his "statements were freely made and would be admissible even had the Court found Ms. Standberry to be acting as a state agent." (*Id*. at 118).

On direct appeal, Petitioner argued that the trial court erred in denying his motion to suppress. (Doc. No. 12-8 at 22–24). Petitioner, in particular, claimed that the trial court's conclusions of law as to the following issues were erroneous: that (1) Ms. Standberry was not acting as a state actor under *Burroughs*' "legitimate independent motivation" test, and (2) the Petitioner was not coerced by Ms. Standberry. (*Id*. at 23). The TCCA, like the trial court, applied the TSC's two-part test in *Burroughs* to determine, as an initial matter, whether Ms. Standberry acted as a government agent, before answering whether Petitioner's statements were coerced. *See Sanders*, 2012 WL 4841545 at *9. It agreed with the trial court's findings that Ms. Standberry was not acting as a government agent, *id*. at *10, and it concluded that Petitioner's statements were not the product of coercion based on the following standards:

> "The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *Stephenson*, 878 S.W.2d at 544). To be considered voluntary, a statement to law enforcement "[]must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.[]" *State v. Brock*, 327 S.W.3d 645, 687 (Tenn. Crim. App. 2009) (quoting *Bram v. United States*, 168 U.S. 532, 542–43, 18 S. Ct. 183, 42 L.Ed. 568 (1897)). Therefore, "voluntariness" hinges upon the inquiry of "[]whether the behavior of the [s]tate's law enforcement officials was such as to overbear [appellant's] will to resist and bring about confessions not freely self-determined . . . .[]" *State v. Kelly*, 603 S.W.2d 726, 728 (1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961)). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the

32

constitutional sense." *Brock*, 327 S.W.3d at 687 (quoting *Smith*, 933 S.W.2d at 455). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary . . . ." *Id*. (quoting *Smith*, 933 S.W.2d at 455). The voluntariness of a statement is determined by an examination of the totality of the circumstances. *See Kelly*, 603 S.W.2d at 728–29.

*Id*. at *10. Applying these standards, the TCCA determined that:

> The totality of the circumstances reveals that appellant was not coerced by Ms. Standberry into making a statement or confession. This court relies on the following factors in so determining: (1) appellant was not in custody; (2) Ms. Standberry maintained a stern, yet non-argumentative tone; (3) the conversation occurred outdoors, i.e., appellant could not have reasonably felt confined or not free to leave at any time; and (4) the conversation occurred within a few feet of appellant's vehicle, to which he held the keys, allowing him to leave at any time. While Ms. Standberry admittedly lied to appellant with regard to ceasing the investigation against him, she was not acting under instructions from law enforcement to do so . . . . Ms. Standberry's tactics did not overbear appellant's will, and we find his statements to be voluntarily given.

*Id*. at *11. The TCCA therefore affirmed the trial court's judgments. *Id*. at *17

Petitioner renewed his position that the trial court erred in denying his motion to suppress before the TSC, arguing that "his state and federal constitutional rights against self-incrimination and to due process of law were violated." (Doc. No. 12-13 at 22). In analyzing Petitioner's claim, the TSC relied on its opinion in *State v. Branam*, 855 S.W.2d 563 (Tenn. 1993) and the Supreme Court's decision in *Hoffa,* 385 U.S. at 293—cases that the TSC characterized as involving "misplaced trust scenario[s]" in which the criminal defendant made incriminating statements to a trusted confidant who, unbeknownst to the defendant, was assisting law enforcement, *Sanders*, 452 S.W.3d at 313. *See Branam*, 855 S.W.2d at 568 (involving statements that the defendant made to his aunt and who law enforcement recruited to serve as a "jail plant" to secure the defendant's confession); *see also Hoffa*, 385 U.S. 293 (involving statements the defendant made to undercover "government informant"). In *Branam*, the TSC determined there was no violation of a defendant's

33

Fifth Amendment right against self-incrimination because no evidence of police compulsion existed in the record. 855 S.W.2d at 568. It also determined that the defendant's due-process rights under the Fourteenth Amendment were not violated because the defendant's statements, "most of which were made spontaneously on his part, were [not] the result of a will that had been 'overborne.'" *Id*. at 569. Similarly, in *Hoffa*, the Supreme Court found that no police compulsion— "a necessary element" to a Fifth-Amendment violation—existed when the defendant confided in an undercover government informant. 385 U.S. at 304. In line with *Hoffa* and *Branam*, the TSC, therefore, characterized Petitioner's case as one involving a "misplaced trust scenario" upon which the Fifth Amendment afforded him no protection. *Sanders*, 452 S.W.3d at 313; *see id*. at 312 ("The circumstances in this case fall squarely in the line of federal and state cases in which a suspect has misplaced his or her trust in an accomplice or other confidant who is or who will be cooperating with law enforcement."); *id*. ("The seminal 'misplaced trust' case is *Hoffa v. United States*.").

The TSC then considered the "remaining question" of whether Petitioner's "will was so severely overborne that his admissions were not the product of a rational intellect with freedom to choose." *Id*. at 317. Relying again on *Branam*, as well as the Supreme Court's opinion in *Illinois v. Perkins*, 496 U.S. 292 (1990),[12] it determined that, "based on the totality of the circumstances," Petitioner's statements were admissible because Ms. Standberry "did not overbear his will and force him to confess" for the following reasons:

---

[12]     The *Perkins* Court held that an undercover law enforcement officer posing as a fellow inmate need not give "*Miranda* warnings" to an incarcerated suspect before asking questions that may elicit an incriminating response. 496 U.S. at 300; *see Miranda v. Arizona*, 384 U.S. 436, 446, 461 (1966) (determining that the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during "custodial interrogation" without "full and effective warning[s] of his rights at the outset of the interrogation process"). In addition, it determined that the defendant's statements were "freely and voluntarily" given. *Id*. at 298. As the TSC noted, the Supreme Court in *Perkins* relied on its opinion in *Hoffa* in concluding that a "tactic employed here [by an undercover agent] to elicit a voluntary confession from a suspect does not violate the Self–Incrimination Clause." *Id*. at 298; *see Sanders*, 452 S.W.3d at 318 n.8.

We find that Mr. Sanders's will was not overborne by L.S.'s questioning. We are dealing here with a prolonged, but not heated, conversation between two adults who lived together for years and had a son together. Mr. Sanders has not given us any reason to believe he was abnormally susceptible to coercion. We agree with the courts below that Mr. Sanders was not in any way trapped during his conversation with L.S. and that he could have left at any time. It was by his own choice that he continued talking for almost two hours. He even thanked L.S. for the conversation.

There is little question that L.S.'s admonitions that she was prepared to summon the police and the media, along with her statements that she could "stop this thing" if Mr. Sanders cooperated accomplished their intended purpose.[] Nevertheless, the recording of the conversation reveals that Mr. Sanders maintained sufficient control of himself to be able to provide a version of the events intended to place his conduct in the best light possible. Only slowly and haltingly did he reveal a series of increasingly inappropriate behaviors. He attempted to blame alcohol and blame the victim for what had happened. Far from taking responsibility for his actions, Mr. Sanders's version of events was directed toward defusing what he must have suspected A.S. had said about his conduct.

There is likewise little question that L.S. shaded the truth about the involvement of DCS and the police in the case. However, she never unequivocally promised Mr. Sanders she would stop the investigation if he admitted his guilt. In fact, L.S. held out the possibility that she might turn the matter over the police and DCS even if Mr. Sanders cooperated. While L.S. used effective tactics to elicit Mr. Sanders's tepid admissions, we do not find that her tactics overbore Mr. Sanders's will and effectively forced him to confess. Under our deferential standard of review, we have no difficulty upholding the trial court's decision to deny Mr. Sanders's suppression motion. The evidence does not preponderate against the trial court's conclusion that Mr. Sanders's confession was a voluntary choice.

*Id.* at 317–18.

    ii.  <u>Analysis</u>

Respondent argues that the TSC's decision does not reflect an unreasonable application of clearly established Supreme Court precedent under § 2254(d)(1). (*See* Doc. No. 13 at 31, 37).

35

According to Respondent, the TSC reasonably applied *Hoffa* and *Perkins* "to the statement made by the petitioner to the victim's mother and recorded by law enforcement officers." (*Id*. at 37). In addition, Respondent asserts that Petitioner was under no compulsion to speak with Ms. Standberry, "and despite repeated denials of misconduct during much of their two-hour conversation," Petitioner "eventually made certain admissions." (*Id*.) For these reasons, Respondent argues that "[a] fairminded jurist could conclude" that Petitioner "was free to leave but that he voluntarily chose to continue the conversation." (*Id*. at 38).

"The starting point for cases subject to § 2254(d)(1) is" for Petitioner "to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs" his claim. *Marshall v. Rodgers*, 569 U.S. 58, 61 (2013) (citations omitted). Petitioner, however, has identified no clearly established Supreme Court precedent that the TSC either contravened or misapplied under § 2254(d)(1) in rejecting his claim. *Cf. Stewart v. Winn*, 967 F.3d 534, 537 (6th Cir. 2020) ("[Petitioner]'s claim fails because he has not identified a Supreme Court holding that clearly establishes his asserted legal rule."). In his Petition, he, instead, merely regurgitates the same arguments he made to the TSC with no reference to the AEDPA's standards under § 2254(d). (*Compare* Doc. No. 1 at 8–12 *with* Doc. No. 12-13 at 10–13). Federal habeas review, however, is "not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S at 102–03 (citation omitted). It, instead, serves only as "a guard against extreme malfunctions in the state criminal justice systems." *Id*. at 102 (internal quotation marks and citation omitted). Petitioner must show this extreme malfunction exists by demonstrating "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

36

However, the Court, mindful that Petitioner's allegations in his *pro se* Petition "are held to less stringent standards than formal pleadings drafted by lawyers," will endeavor to consider his claims, *Franklin v. Rose*, 765 F.2d 82, 84–85 (6th Cir.1985) (internal quotation marks and citation omitted), and it will begin its discussion with the "governing legal principles set forth by the Supreme Court at the time the" TSC rendered its decision, *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citations omitted). Confessions must be free and voluntary to be admitted into evidence. *See Dickerson v. United States*, 530 U.S. 428, 433–34 (200); *see also Beckwith v. United States*, 425 U.S. 341, 347 (1976) (recognizing that "*noncustodial* interrogation might possibly in some situations, by virtue of special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist'" (emphasis added) (quoting *Rogers*, 365 U.S. at 544)); *Miranda*, 384 U.S. at 468 (establishing procedural safeguards to ensure that persons subject to *in-custody* interrogations do not succumb to the "inherent pressures of the interrogation atmosphere" (emphasis added)).

The Supreme Court has recognized "two constitutional bases" for this requirement: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment. *Dickerson*, 530 U.S. at 433. Whether a confession is voluntary "is controlled by that portion of the fifth amendment to the" United States Constitution, which commands that "no person shall be compelled in any criminal case to be a witness against himself." *Bram*, 168 U.S. at 542 (internal quotation marks and citation omitted). The use of an involuntary confession obtained as the basis for a conviction is also "a clear denial of due process"—"a wrong so fundamental that it ma[k]e[s] the whole proceeding a mere pretense of a trial and render[s] the conviction and sentence wholly void." *Brown v. Miss.*, 297 U.S. 278, 286–87 (1936). Both

37

Amendments, therefore, guarantee procedural safeguards "to protect, at all times, people charged with or suspected of crime[.]" *Chambers v. Fla.*, 309 U.S. 227, 236 (1940).

Coercive police activity, however, is a necessary predicate to a Fourteenth and Fifth Amendment violation. *See Colo. v. Connelly*, 479 U.S. 157, 164 (1986) ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."); *see also Oregon v. Elstad*, 470 U.S. 298, 305 (1985) ("Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." (internal quotation marks and citation omitted)). In this vein, the Supreme Court has held that the federal constitution affords no protection to an individual who voluntarily makes incriminating statements to a confidant or undercover government informant. *See, e.g., Hoffa*, 385 U.S. at 413 (recognizing that the Constitution affords no protection to a wrongdoer's misplaced belief "that a person to whom he voluntarily confides his wrongdoing will not reveal it"); *United States v. Henry*, 447 U.S. 264, 272 (1980) ("[T]he Fifth Amendment has been held not to be implicated by the use of undercover Government agents before charges are filed because of the absence of the potential for compulsion." (citing *id*. at 303–04)).

The TSC correctly identified the above standards in its opinion. It explained that, as an initial matter, "'a necessary element of a compulsory self-incrimination [in the Fifth Amendment context] is some kind of compulsion.'" *Sanders*, 452 S.W.3d at 313 (quoting *Hoffa*, 385 U.S. at 304)); *id*. at 312 ("These constitutional provisions are not concerned with moral or psychological pressures to confess emanating from sources other than *official* coercion." (emphasis added) (internal quotation marks and citations omitted)). And the same is true, it further explained, in the Fourteenth-Amendment context because "[j]ust as the . . . Fifth Amendment[] do[es] not protect criminal suspects from having their trust betrayed by police informants, neither does the Due

Process Clause of the Fourteenth Amendment." *Id.* at 315 ("As the United States Supreme Court made clear . . . 'The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause[.]'" (quoting *Connelly*, 479 U.S. at 166)). The TSC then identified the correct governing legal standard when considering whether Petitioner's statements were voluntary:

> Although the state and federal constitutions provide no protection to the suspect who 'voluntarily' makes incriminating statements to a confident . . . we examine[] *the totality of the circumstances* . . . to satisfy ourselves that they were [not] the result of a will that had been overborne.

*Id.* at 316 (emphasis added) (internal quotation marks and citation omitted); *see Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (applying the *totality-of-the-circumstances* standard when determine whether the defendant's confession was coerced, in violation of his "rights to due process under the Fifth *and* Fourteenth Amendments") (emphasis added).

The next question is whether the TSC applied these standards "unreasonably to the facts of" Petitioner's case, and this Court cannot conclude that it did. *Williams*, 529 U.S. at 407–08. Petitioner places particular emphasis on Ms. Standberry's "threats . . . 'infamy' and promises" in support of his argument that he was psychologically coerced into confessing. (Doc. No. 1 at 11). The Supreme Court has held that coercion can be physical or mental, *Fulminante*, 499 U.S. at 287, and in both the Fifth and Fourteenth Amendment context, the Supreme Court has considered the totality of the circumstances when determining whether a suspect's will is overborne, *see id.* at 284–85. (Doc. No. 1 at 8–12). The Sixth Circuit has recognized that "promises of leniency and threats of prosecution can be objectively coercive." *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003)). A promise is objectively coercive if it is "broken or illusory." *Id.* at 262. But even then, "the coercion in question" must also be "sufficient to overbear the defendant's will." *Id.* at

260 (establishing a three-part test for determining whether a confession is involuntary due to police coercion).

During the hearing on Petitioner's motion to suppress, Ms. Standberry, during cross-examination, acknowledged that some of her statements to Petitioner were untrue:

> Q. [Y]ou said, I've got this in my hand. Do you remember saying that?
>
> A. Yes.
>
> Q. And, again, do you remember saying, when she [A.S.] goes to the [forensic] interview, everything is going to come out?
>
> A. Yes.
>
> Q. But, again, she [A.S.] had already been to the forensic interview. . . . So, in fact, Ms. Standberry, you did lie some during the . . . .
>
> A. Yes.
>
> Q. And your purpose was to get him to confess as you said?
>
> A. Pretty much, yes.

(Doc. No. 12-3 at 24:23–25; *id*. at 25:1–20).

Still, the record does not support that Ms. Standberry's statements, when considering the totality of the circumstances, were "objectively coercive." *Johnson*, 351 F.3d at 260. As the TSC recognized, any promises of leniency she made to Petitioner were not unequivocal, and likewise, she did not unequivocally foreclose the possibility that Petitioner may face legal repercussions. *Sanders*, 452 S.W.3d at 317 ("[S]he never unequivocally promised Mr. Sanders she would stop the investigation if he admitted his guilt. In fact, L.S. held out the possibility that she might turn

40

the matter over the police and DCS even if Mr. Sanders cooperated."); *cf. United States v. Siler*, 526 F. App'x 573, 576 (6th Cir. 2013) (holding that investigator's statements were "objectively coercive" when his promises were "repetitive" and "*very clear* that no one would be charged" if the defendant confessed) (emphasis added)). For example, Ms. Standberry, early on in her conversation with Petitioner, was steadfast in believing her daughter A.S.'s accusations; she stated that she already knew the truth, and she wanted to hear that truth from Petitioner for closure and to help A.S. (Doc. No 12-7 at 18–21, 35, 57; *see id*. at 20 (stating that "a child cannot make up these things"). And although she informed Petitioner that she had "the power to stop this thing," (*id*. at 18), she also stated, prior to any confession, that she did not "want it to go any farther" but was "left with no other choose [sic] but to pursue this thing," (*id*. at 20; *see id*. at 21(stating, again, that she had "no other choice but to pursue this")). She also told Petitioner that the justice system would show A.S. that "people can[not] get away with such [] things that they do, like what" Petitioner did. (*Id*. at 68). In addition, she disagreed with Petitioner that his imprisonment would not help A.S., holding out the possibility that he could face legal consequences. (*Id*.)

Even assuming, however, that Ms. Standberry's statements to Petitioner were objectively coercive, the TSC reasonably could have concluded that the "coercion in question was [in]sufficient to overbear the [Petitioner]'s will." *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016). The details of the interrogation, as well as the characteristics of the accused, are relevant to whether, based on the "totality of all the surrounding circumstances," Petitioner's will was overborne. *Schneckloth v. Bustamonte*, 412 U.S. 219, 226 (1973). Factors the Supreme Court has considered are the duration and nature of the questioning, location of the questioning, and the threat of physical punishment. *See, e.g. Schneckloth*, 412 U.S. at 226 (identifying the "prolonged nature of the questioning" as a relevant factor); *Payne v. Ark.*, 356 U.S. 560, 566 (1958)

41

(considering threat of mob violence); *Fikes v. Ala.*, 352 U.S. 191, 197 (1957) (recognizing that location of questioning is a fact "to be weighed"). The Supreme Court has also considered the accused's age and intelligence, education, and prior criminal record. *See, e.g.*, *Reck v. Pate*, 367 U.S. 433, 441 (1961); *see United States v. Jacobs*, 63 F.4th 1055, 1059 (6th Cir. 2023) (recognizing that the more mature a suspect is "the more likely he is to be able to resist pressure during an interrogation").

At the outset, the inherently coercive setting of police custodial interrogation is absent here. *See Schneckloth*, 412 U.S. at 247 (recognizing that "the nature of custodial surroundings produce an inherently coercive situation"). Petitioner was not in police custody during the body-wire conversation, and the conversation took place outside of Ms. Standberry's home—an area that, Ms. Standberry testified at the suppression hearing, was familiar to Petitioner. (Doc. No. 12-3 at 14:24–25); *cf. United States v. Sater*, 477 F. Supp.3d 372, 387 (M.D. Pa. 2020) (determining that the defendant's will was not overborne when, in addition to other factors, noncustodial interview took place in the doorway of the defendant's own home).

In addition, notwithstanding that the body-wire conversation was approximately two-hours long, the record supports that Petitioner was willing to speak with Ms. Standberry at his own volition, and he was free to leave or end the conversation at any time. Petitioner, for instance, drove to Ms. Standberry's home in his own car where he engaged in a conversation with her regarding the allegations against him. (Doc. No. 12-3 at 15). The conversation took place in Ms. Standberry's driveway with Petitioner standing just a few feet away from his car, (*id*. at 15:13–17), and Ms. Standberry testified during the suppression hearing that Petitioner also had his car keys with him during the entirety of the conversation, (*id*. at 15:18–23). According to Detective Mayo, Petitioner would even reinitiate the conversation with Ms. Standberry during periods of

silence. (*Id*. at 34:14–25; 35:1–4). And although Ms. Standberry did tell Petitioner to confess (*see* Doc. No. 12-7 at 35, 56, 61), Detective Mayo denied ever hearing Ms. Standberry yell or use abusive language towards Petitioner, (Doc. No. 12-3 at 37). As the TSC noted, Petitioner even thanked Ms. Standberry several times for speaking with him. *Sanders*, 452 S.W.3d at 317; (*see* Doc. No. 12-7 at 88); *see also United States v. Luck*, 852 F.3d 615, 623 (6th Cir. 2017) (considering the tone of conversation).

Petitioner's characteristics also cut against a finding that his will was overborne by Ms. Standberry's statements. Petitioner was forty-five years old at the time, and he had a prior criminal background. (*See* Doc. No. 12-7 at 3 (presentence report)). Although he dropped out of high school when his mother passed away, the record shows that he earned his G.E.D. and a certificate in wielding. (*Id*. at 7). Accordingly, as the TSC observed, there is no reason "to believe he was abnormally susceptible to coercion." *Sanders*, 452 S.W.3d at 317; *cf. Jacobs*, 63 F.4th at 1059 (determining that the petitioner was "sophisticated enough that" law enforcement's conduct "wouldn't have overborne his will," given that he was forty-three years old, "had previous experience with the criminal-justice system[,]" and had a college education).

For the foregoing reasons, the TSC reasonably could have concluded that, based on the totality of the circumstances, Petitioner's will was not overborne. *Sanders*, 452 S.W.3d at 317–18. Petitioner has not shown that the TSC's adjudication of this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2242(d)(1). He also has not shown that it was based on "an unreasonable determination of the facts in light of the evidence in the State court proceeding." *Id*. § 2254(d)(2).

43

c. Sixth Amendment Claim

Petitioner also claims his Sixth Amendment rights "were violated" when the trial court denied his pretrial motion to suppress. (Doc. No. 1 at 12). According to Respondent, the TSC "rightly observed that the Sixth Amendment right to counsel had not yet attached at the time of the statement[s]" to Ms. Standberry. (Doc. No. 13 at 36 n.9 (citing *Sanders*, 452 S.W.3d at 316 n.12)). The TSC stated in its opinion that because Petitioner "had not yet been charged with a crime when he confessed, the voluntariness standards under the Sixth Amendment right to counsel are not implicated." *Sanders*, 452 S.W.3d at 318 n.12 (citing *Henry*, 447 U.S. at 270–71 (explaining that obtaining confessions using undercover agents after charges are filed is "quite a different matter" from doing so before charges are filed against a suspect)).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right, however, "is offense specific," *McNeil v. Wisconsin*, 501 U.S. 171, 177 (6th Cir. 1991), and therefore, a defendant cannot invoke it until a prosecution is commenced, whether "by way of formal charge, preliminary hearing, indictment, information, or arraignment," *Kirby v. Ill.*, 406 U.S. 682, 689 (1972). And just as the right is offense specific, so is its "effect of invalidating subsequent waivers in police-initiated interviews." *McNeil*, 501 U.S. at 175. In other words, the right does not protect a defendant who makes incriminating statements regarding an offense for which he has not yet been charged. *See Maine v. Moulton*, 474 U.S. 159, 192 n.16 (1985) ("Incriminating statements pertaining to [] crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at trial[.]"). Petitioner and Ms. Standberry's body-wire conversation occurred April 24, 2008, (Doc. No. 12-1 at 16), several months before the state filed any formal charges against him, (*id.* at 8–13 (indictment)). His Sixth Amendment right to counsel

44

therefore did not attach at the time of the body-wire conversation. He therefore cannot claim then that any incriminating statements he made to Ms. Standberry at that time were inadmissible. For these reasons, Petitioner is not entitled to relief as to this claim.

## 2. Ground 2: Motion for Judgment of Acquittal

In ground two of his Petition, Petitioner argues that the trial court erred in denying his motion for judgment of acquittal because "there was a material variance between the [state's] bill of particulars and the evidence presented at trial." (Doc. No. 1 at 16). Because the variance was "material," Petitioner asserts that the trial court violated his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments when it denied his motion. (*Id*.)[13]

---

[13]     In his Petition, Petitioner, with the exception of Grounds 3 and 11, uses a catch-all phrase in the last sentence of each claim that his rights under the Fifth, Sixth, and Fourteenth Amendments "were violated." (Doc. No. 1 at 12 (Ground 1); *id*. at 16 (Ground 2); *id*. at 22 (Ground 4); *id*. at 27 (Ground 5); *id*. at 30 (Ground 6); *id*. at 34 (Ground 7); *id*. at 39 (Ground 8); *id*. at 49 (Ground 9); *id*. at 52 (Ground 10)). Again, the Court is mindful that Petitioner's *pro se* Petition is afforded liberal construction, which means that "active interpretation in some cases [is necessary] to construe a pro se petition to encompass any allegation stating federal relief." *Franklin*, 765 F.2d at 85 (internal quotation marks and citation omitted). At the same time, this rule has limits; the Court is neither obligated to conjure allegations on Petitioner's behalf, nor is Petitioner "entitled to have the Court engage in guesswork or to construct his pleadings by surveying his documents and handpicking statements that support his claim." *Freeman v. United States*, No. 3:19-CV-88889, 2023 WL 352901, at *21 (E.D. Tenn. Jan. 20, 2023) (citing *Erwin v. Edwards*, 22 F. App'x 579, 590 (6th Cir. 2001)). And as to this claim (Ground 2), a review of Petitioner's appellate brief on direct appeal to the TCCA shows that he did not raise a federal constitutional claim under the Fifth or Sixth Amendments based on any material variance between the bill of particulars and state's election of offenses. (Doc. No. 12-8 at 30–35). In addition, in the state-court opinions Petitioner cited in his appellate brief, the state courts did not employ a federal constitutional analysis under the Fifth or Sixth Amendments. (*Id*. (citing *State v. Osborne*, 251 S.W.3d 1, 15 (Tenn. Crim. App. 2007); *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000); *State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *State v. Shelton*, 851 S.W.2d 134, 136 (Tenn. 1993); *State v. Holloman*, 835 S.W.2d 42, 45 (Tenn. Crim. App. 1992); *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984); *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973))). To the extent that he intends to raise a Fifth and Sixth Amendment claim in Ground 2 of his Petition, he has therefore failed to exhaust these claims before the state courts. As he no longer has an avenue to further present these claims to the state courts, he has also procedurally defaulted any Fifth and Sixth Amendment claim. *See* Tenn. R. App. P. 4(a) (establishing thirty-day deadline for filing an appeal, which runs from the date of entry of conviction) *see also* Tenn. Code Ann. § 40-30-102(c) (prohibiting the filing of more than one petition for post-conviction relief attacking a single judgment).

The record shows, and Respondent does not dispute, that Petitioner raised the factual basis of this claim on direct appeal. Petitioner argued on appeal that the trial court erred in denying his motion for judgment of acquittal because the variance between "the State's proof at trial and its election of offenses materially varied from its bill of particulars." (Doc. No. 12-8 at 31). First, Petitioner asserted that "the *acts* described in the bill of particulars" as to counts 1, 5, 6, 7, and 8 were "different than the acts described in the election of offenses." (*Id*. at 33 (emphasis added0). Consequently, Petitioner argued that the alleged offenses in its bill of particulars were not proven at trial. (*Id*. at 34–35). In addition, Petitioner claimed that the state's election of offenses and the bill of particulars varied as to *where* each offense occurred. (*Id*. at 30–31) For instance, the state alleged in its election of offenses that the acts occurred at Ms. Standberry's residence on Apache Trail or Petitioner's apartment on Linbar Drive, but the bill of particulars only specified that each offense occurred at Valley Brook Apartments. (*Id*. at 33–34). Accordingly, Petitioner claimed that he "was not given notice that he would have to defend against allegations that he committed crimes at the residences on Apache Trail and Linbar Drive." (*Id*. at 35).

The federal constitutional basis upon which Petitioner raises his claim is difficult to follow. Again, Petitioner argued on appeal that the trial court erred in denying his motion for judgment of acquittal because the variance was "material," but he rested solely on state-law opinions in support of his position. (*Id*. at 30–35). To the extent that Petitioner claims trial-court errors amounting to violations of state, not federal, law, "it is not the province of a federal habeas court to reexamine state court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Again, the Court is mindful, however, that it must construe Petitioner's *pro se* Petition more liberally than those drafted and filed by an attorney. To the extent therefore that Petitioner attempts to renew his claim that the state failed to afford him adequate notice of the charges against

him due to the variance in the bill of particulars and the state's election of offenses, (*see* Doc. No. 12-8 at 35), the Court will endeavor to consider it, albeit within the constraints of § 2254(d). *See Madden v. Tate*, 830 F.2d 194 (Table) (6th Cir. 1987) (recognizing that the petitioner's claim "that the indictment failed to provide him sufficient notice of the charges to enable him to prepare his defense . . . *is* cognizable in a federal habeas corpus case" (emphasis added)).

"It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process." *Jackson v. Va.*, 443 U.S. 307, 314 (1979) (citations omitted). "[N]otice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole v. Ark.*, 333 U.S. 196, 201 (1948). In this vein, "[t]he Due Process Clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense." *Koontz*, 731 F.2d at 369 (citations omitted). "This requires that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged." *Id*.

In its Answer, Respondent states that, to the extent that "the alleged variances identified here implicate a constitutional violation," it directs the Court to the Sixth Circuit's opinion in *Geboy v. Brigano*, 489 F.3d 752, 761–66 (6th Cir. 2007) as instructive. (Doc. No. 13 at 42). The Court, in reviewing *Geboy*, does find this case instructive in analyzing Petitioner's claim because the habeas petitioner, like Petitioner herein, argued that the trial court erred in denying his motion for judgment of acquittal because the bill of particulars and the state's evidence at trial varied as to *where* each offense occurred. *State v. Geboy*, No. 14-02-09, 2003 WL 178616, at *2 (Ohio Ct. App. Jan. 28, 2003); *see Geboy*, 489 F.3d at 764 (noting that the state court found that the petitioner

47

was afforded "sufficient notice and opportunity to develop evidence and arguments as to any discrepancies between the locations of the alleged abuse and his [the petitioner's] whereabouts during these periods" (citing *Geboy*, 2003 WL 178616 at *3)). As a result, the petitioner asserted that he was not afforded adequate notice of the charges against him because he "was confined to proving abuse in the family home as stated in the bill of particulars." *Geboy*, 489 F.3d at 760.

The state appellate court disagreed with the petitioner's argument for a few reasons. First, it recognized that, under Ohio law, "the purpose for giving a bill of particulars is to elucidate or particularize the conduct of the accused"—not to "provide the accused with specifications of evidence or to serve as a substitute for discovery." *Id*. at 760 (internal quotation marks and citations omitted). It further recognized that "a certain degree of inexactitude in averments is not necessarily fatal to a prosecution in cases dealing with sex offenses against victims of tender years." *Id*. at 760–61 (internal quotation marks and citation omitted). And even if were to find that the bill of particulars was not as specific with respect to location as it should have been, the state court concluded that the petitioner failed to show he was prejudiced by any variance for the following reasons:

> Both the indictment and the bill of particulars give specific dates such that at all times [Petitioner] had the ability to defend himself from the allegations of abuse. [Petitioner] was aware that he lived outside the family home during the periods articulated in counts nine and ten and could have requested a more specific bill of particulars with respect to locations. [Petitioner] had the opportunity to cross-examine [the victim] regarding the specific locations of her alleged abuse. Furthermore, during closing arguments, [Petitioner]'s trial counsel pointed out to the jury that the [Petitioner] lived in an apartment and that the victim never specifically identified the apartment as a location of abuse. Clearly, [Petitioner] was not harmed by any inconsistencies in the bill of particulars or the indictment.

*Geboy*, 2003 WL 178616 at *3.

48

The Sixth Circuit disagreed with the district court's conclusion that the petitioner was entitled to habeas relief under § 2254(d). *Geboy*, 489 F.3d at 754. First, the Sixth Circuit, in relying on Ohio law, explained that the variance in the bill of particulars did not "operate to elevate [] location to an element of the various offenses charged in the indictment" for a few reasons. *Id*. at 763. It explained that, under Ohio law, "the State cannot permissibly amend an indictment, whether directly or through a bill of particulars, if the result would be that the offenses charged in the original and amended indictments are different crimes that require proof of different elements." *Id*. at 762. So, "[a]pplying these principles," the Sixth Circuit explained that "the sorts of details supplied in a bill of particulars typically do not qualify as elements of the offenses charged in an underlying indictment." *Id*. at 762–63. In addition, it characterized any variance as "a mere variance" because "location" was not an essential element of the crime for two reasons: (1) the Ohio statute was silent as to location, and (2) "the Ohio courts have concluded in a number of cases that precise dates and times were not elements of the charged offenses, and thus need not have been set forth in the indictment." *Id*.

In rejecting Petitioner's claim, the TCCA similarly recognized that it "has long been 'sensitive to the fact that young children who are victims of child abuse may not be able to testify that abuse occurred on a specific date, or provide extensive details in this regard.'" *Sanders*, 2012 WL 4841545 at *13 (quoting *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999)). It also recognized that a variance between an indictment or subsequent bill of particulars and evidence presented at trial must be fatal to qualify as reversible error. *See id*. at *12. Under Tennessee law, a variance is fatal if it is material and prejudicial. *Shropshire*, 45 S.W.3d at 71. A variance is not material when the *indictment* and proof substantially correspond. *Id*. The TCCA declined to find

49

that any variance between the indictment and bill of particulars as to location was fatal, and it

determined that Petitioner had adequate notice of the offenses:

> Appellant claims that each count of the indictment suffers a fatal
> variance because the bill of particulars alleged that each occurrence
> took place at the home on Valley Brook Drive, but the victim
> testified that the offenses took place in the home on Apache Trail
> and in appellant's apartment on Linbar Drive. We decline to find
> that this variance is material or that appellant suffered prejudice
> therefrom. The State narrowed the offense dates in question to a
> period of time between September 1, 2005, and January 25, 2008 [in
> the indictment], times during which appellant lived at both
> residences to which the victim testified. He had adequate notice
> about the offenses against which he must prepare to defend.

*Sanders*, 2012 WL 4841545 at *13.

The TCCA also determined that any inconsistencies in the bill of particulars and the state's

election as to Petitioner's *conduct* were neither material nor prejudicial to him:

> We conclude that despite the inconsistencies between the bill of
> particulars and the State's elections, the State provided appellant
> with enough details of the offenses to allow him to prepare a
> defense. In light of the statutory definitions of the offenses, both the
> bill of particulars and the State's elections encompassed conduct
> that constitutes aggravated sexual battery and rape of a child.
> Appellant was protected from unfair surprise at trial. Finally,
> appellant cannot be prosecuted twice for the same offenses alleged
> in this case . . . . The bill of particulars provided appellant the
> necessary protections to ensure due process.
>
> We must next determine whether the variance between the bill of
> particulars and the State's elections is material and prejudicial. The
> prohibited conduct is the same criminal offenses in both the bill of
> particulars and the elections. Similarly, this court has previously
> held that a variance was not material when an indictment alleged the
> defendant performed an oral sex act on a child, but the proof
> established that the victim fellated the defendant. *State v. Jones*, 953
> S.W.2d 695, 700 (Tenn. Crim. App. 1996) (citing *State v. Steven K.*
> *Sterna*, No. 01C01-9007-CR-00163, 1991 WL 135006 (Tenn. Crim.
> App. July 24, 1991)). Appellant was not misled or surprised at trial.
> Appellant was indicted for four counts of rape of a child, two of
> which involved vaginal penetration with his penis. The variance
> between the proof at trial and the bill of particulars with regard to

two counts of rape of a child does not constitute "surprise." Finally, appellant is protected from double jeopardy. "When the indictment and the proof substantially correspond, the Defendant is not misled or surprised at trial, and there is protection against a second prosecution for the same offense, the variance is not considered material." *Osborne*, 251 S.W.3d at 15 (citing *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984)). We conclude that the variances are immaterial. Appellant has failed to argue or even address the issue of prejudice. Appellant failed to demonstrate either during or after trial that he was prejudiced by the prosecution's election of offenses that involved different means of aggravated sexual battery or unlawful penetration than that described in the bill of particulars. See *State v. Speck*, 944 S.W.2d 598, 601 (Tenn. 1997). Appellant categorically denied the charges in his statement to law enforcement. He did not offer a defense geared toward those specific acts. *See id.* "Similarly, [appellant] did not offer any defenses post-trial that he would have used at trial were it not for the specific [acts] set forth in the bill of particulars." *Id.*; *see also State v. Ealey*, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997) (holding that appellant "failed utterly" to demonstrate how he suffered prejudice by not offering on this appeal any defenses that may have been available to him were it not for the variances between the bill of particulars and the State's proof). Accordingly, we conclude that appellant has failed to demonstrate that he was prejudiced in his defense at trial. He is not entitled to relief on this issue.

*Id.* at *14.

The TCCA reasonably could have concluded that Petitioner received "adequate notice" of the charges against him to adequately prepare his defense. *Sanders*, 2012 WL 4841545 at *13. The Supreme Court has recognized that an *indictment* must contain all the essential elements of the offense. *See United States v. Debrow*, 346 U.S. 374, 375 (1953) ("An indictment is required to set forth the elements of the offense sought to be charged). Under Tennessee law, "[t]he indictment," likewise, "must contain all the essential elements of the offense." *VanArsdall v. State*, 919 S.W.2d 626, 631 (Tenn. Crim. App. 1995). Also, under Tennessee law, a "bill of particulars does not assume the character of an indictment and cannot resuscitate it" if the indictment is defective. *State v. Mencer*, 798 S.W.2d 543, 546 (Tenn. Crim. App. 1990). In addition, the purpose of a bill of

51

particulars under Tennessee law "is not to lock the State into a specific theory of prosecution." *State v. Sherman*, 266 S.W.3d 395, 409 (Tenn. 2008). Instead, and as the TCCA recognized, it serves three purposes. *Sanders*, 2012 WL 4841545 at *12. First, it provides a "defendant with information about the details of the charge against him if this is necessary to the preparation of his defense." *Id*. (internal quotation marks and citation omitted). Second, it assures that a defendant can arm himself against "prejudicial surprise at trial." *Id*. (internal quotation marks and citations omitted). And third, the bill enables the defendant to preserve a plea against double jeopardy. *Id*.

Based on these state-law principles, the state's "specific reference in the bill of particulars to" Valley Brook Apartments did not "operate to elevate [] location to an element of the various offenses charged in the indictment." *Geboy*, 489 F.3d at 763.[14] In addition, the offenses for which Petitioner was charged do not define location as an essential element for aggravated sexual battery or rape of a child. *See* Tenn. Code Ann. § 39-13-504; *see also id*. § 39-13-522. The statutes, rather, are silent as to location. *See Geboy*, 489 F.3d at 763 ("As noted earlier, nothing in the indictment or the underlying statute that defines the crime of felonious sexual penetration indicates that location is an element of this offense. Rather, the statute is silent as to location[.]"). Petitioner, therefore, cannot claim that the state's failure to provide the precise location of where each offense occurred amounts to a due-process violation when location is not an essential element of the offense. *Cf. Madden v. Tate*, 830 F.2d 194 (Table) (6th Cir. 1987) ("Time is not of the essence of the offense charged in this case . . . . There was no denial of due process."). The TCCA's conclusion therefore that Petitioner received "adequate notice" of the charges against him to adequately

---

[14]     Similar to the petitioner in *GeBoy*, Petitioner does not suggest in his Petition that the indictment was insufficient or somehow defective under Tennessee law. 489 F.3d at 762 ("Petitioner has not suggested that the indictment was deficient under Ohio law for lack of a more specific location where these offenses allegedly were committed."). He specifically references the bill of particulars, asserting that the variances between it and the state's election of offenses were material. (Doc. No. 1 at 14–16).

52

prepare his defense, *Sanders*, 2012 WL 4841545 at *13, was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103.

The TCCA, moreover, reasonably could have concluded that any variance in the bill of particulars and the state's election of offenses did not prejudice Petitioner. The Supreme Court has explained that a variance in proof warrants reversal of a conviction only if it affects the substantial rights of the accused. *Berger v. United States*, 295 U.S. 78, 81–82 (1935); *see Geboy*, 489 F.3d at 764 ("[A] variance in proof warrants the reversal of a conviction only if it "affect[s] the substantial rights of the accused." (quoting *id*. at 82)). A defendant's substantial rights are affected when the variance "prejudicially surprise[s]" him at trial. *United States v Miller*, 471 U.S. 130, 134–35 (1985) (citations omitted).

This Court has reviewed Petitioner's appellate brief before the TCCA, and Petitioner did claim that the variance as to *location* was prejudicial. (Doc. No. 12-8 at 34–35 (stating that he was "certainly surprised to learn at trial that he was charged with committing crimes on Apache Trail and Linbar Drive when the bill of particulars mentioned only the Valley Brook residence"). However, as the TCCA recognized, he failed to advance any meaningful argument as to how any variance as to *conduct* prejudiced him. (*See* Doc. No. 12-8 at 34–35); *see also Sanders*, 2012 WL 4841545 at *13 ("[A]ppellant focuses this court's attention on the difference in the locations at which the offenses occurred but mentions merely in passing that the proof elected by the State differed from the bill of particulars in the *conduct* that was alleged." (emphasis added)). Accordingly, the TCCA's conclusion that Petitioner failed to establish that he was prejudiced by any variance between the bill of particulars and the state's election of offenses as to conduct was

not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

In addition, the TCCA reasonably could have concluded that any variance in the bill of particulars and the state's election of offenses as to location did not prejudice Petitioner. In *Geboy*, the Sixth Circuit concluded that the state court's determination that the petitioner was not prejudiced by any variance was neither contrary to nor an unreasonable application of "the federal law governing variances of proof" because the record showed that the petitioner had the opportunity to cross examine the victim about the specific locations of the alleged abuse. 489 F.3d at 756, 764–66. Here, the record similarly shows that Petitioner had the opportunity to cross examine A.S. regarding when and where each offense occurred, and the record further shows that he availed himself of that opportunity as follows:

> Q. Miss Standberry, you said you didn't really remember a lot of the details about what had happened; is that right?
>
> A. Yes.
>
> Q. So for each time that you talked about do you remember exactly when happened?
>
> A.  No, not really. Sometimes I would remember the address, sometimes I won't remember the address . . . .
>
> Q. So you don't remember the dates?
>
> A. No.

(Doc. No. 12-4 at 92:20–25; *id*. at 93:1–2; *id*. at 93:19–20); *see Geboy*, 489 F.3d at 761 (observing that the petitioner "had the opportunity to cross-examine" the victim at trial "regarding the specific locations of her alleged abuse" (citing *Geboy*, 2003 WL 178616 at *3)). During closing argument, Petitioner's trial counsel also highlighted the inconsistencies in Ms. Standberry and A.S's

54

testimonies as to whether A.S. visited him at the Linbar Drive location where Petitioner lived. (Doc. No. 12-5 at 88:22–25); *Geboy*, 2003 WL 178616 at * 3 (concluding that the petitioner failed to establish prejudice when "during closing arguments, Appellant's trial counsel pointed out to the jury that the Appellant lived in an apartment and that the victim never specifically identified the apartment as a location of abuse"). Thus, any contention on Petitioner's part that he was "surprise[d]" by this variance is not supported by the record. (Doc. No. 1 at 14).

For the foregoing reasons, Petitioner has not shown that the TCCA's rejection of this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). He has also not shown that its rejection of this claim was an unreasonable determination of the facts. *Id*. § 2254(d)(2).

3. Ground 3: Consecutive Sentencing

As to Petitioner's final claim of trial error, he argues that the trial court erred in imposing partial consecutive sentences. (Doc. No. 1 at 19). Respondent argues in its Answer that this claim is not cognizable on habeas review because it does not allege a violation of federal law. (Doc. No. 13 at 43).

Under 28 U.S.C. § 2254, a federal district court may entertain a petition for a writ of habeas corpus "only on the ground that [the petitioner] is in custody by violation of the Constitution or law or treaties of the United States." *Id*. § 2254(a). Petitioner neither frames this claim as a federal constitutional issue nor does he claim a denial of any specific constitutional right. (*See* Doc. No. 1 at 17–19). Also, on direct appeal, this claim was limited to challenges to Tennessee's sentencing statutes. (*See* Doc. No. 12-8 at 38 (arguing that § 40-35-115(b)(6) "does not warrant the imposition of partial consecutive sentences in this case"); *see also id*. (arguing, in the alternative, that his sentence "violates the principles of sentencing set forth in T.C.A. §§ 40-35-103(2) and (4)")). A

55

challenge to the state court's application of Tennessee's sentencing statutes, however, is not cognizable in this federal habeas corpus action. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law[.]" (citations omitted)). Accordingly, the Court agrees with Respondent that this claim is not cognizable.

## B.     Claims of Ineffective Assistance of Counsel – Grounds 4 through 10

Petitioner pleads numerous claims of ineffective assistance of counsel, which he raised in his petition for post-conviction relief. (Doc. No. 12-16 at 90–99, 105). The trial court denied each claim, (*see* Doc. No. 12-17 at 3–48), and he renewed them on appeal to the TCCA, (Doc. No. 12-25 at 43–91). They are therefore exhausted, and Respondent does not dispute this point. *See* Tenn. S. Ct. R. 39 ("[A] claim presented to the Court of Criminal Appeals shall be considered exhausted[.]"); (*see also* Doc. No. 13).

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to effective assistance of counsel. *See* U.S. Const. amend. VI. The standards set forth in the Supreme Court's opinion in *Strickland* govern Petitioner's ineffective-assistance-of-counsel claims and is clearly established law for purposes of review under § 2254(d). *See Bell v. Cone*, 535 U.S. 685, 688–89 (2002). To establish that counsel was ineffective under *Strickland*, a defendant must satisfy a two-part test. 466 U.S. at 687. First, the defendant must show that counsel's performance was deficient by "identify[ing] the acts or omissions . . . that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. Second, a defendant must show that counsel's "deficient performance prejudiced the defense." *Id*. at 687. To satisfy the prejudice component, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A court, however, need not determine whether counsel's performance was deficient before examining

56

whether the defendant suffered prejudice. *Id*. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id*.

The proper measure of counsel's performance is whether counsel's alleged errors "fell below an objective standard of reasonableness" under prevailing professional norms. *Id*. at 687–88. The *Strickland* Court, however, stopped short of establishing a checklist for evaluating the reasonableness of attorney performance, because "[t]here are countless ways to provide effective assistance of counsel in any given case." *Id*. at 689. A court, rather, must judge the reasonableness of counsel's challenged conduct on the facts and circumstances of the case and based on counsel's perspective at the time. *Id*. at 688, 690.

Accordingly, judicial scrutiny is highly deferential to counsel's performance and "doubly so when, as here, a court applies the standards under *Strickland* and § 2254(d) in tandem. *Burt*, 571 U.S. at 15 (explaining that the standards under the AEDPA and under *Strickland* "do not permit federal judges to so casually second-guess the decisions of their state-court colleagues or defense attorneys"). In addition, because the *Strickland* standard is a general one, the range of reasonableness is substantial, meaning "the greater the potential for reasoned disagreement among fair-minded judges" and "the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Renico,* 559 U.S. at 776 (internal quotation marks and citations omitted).

As an initial matter, the TCCA identified *Strickland* as governing Petitioner's ineffective-assistance-of-counsel claims. *Sanders*, 2020 WL 2394992 at *6–7. The remaining issue, then, is whether Petitioner is entitled to relief on the basis that the TCCA's adjudication of these claims was "contrary to, or involved an unreasonable application of," *Strickland*. 28 U.S.C. § 2254(d)(1); *see Bell*, 535 U.S. at 698–99 (2002).

57

1. <u>Ground 4: Failure to Obtain Expert Witness</u>

Petitioner argues that trial counsel was ineffective for failing to obtain an expert witness on false confessions. (Doc. No. 1 at 22). In support of this claim, Petitioner specifically points to his trial attorney's testimony during the hearing on his petition for postconviction relief. According to Petitioner, she testified that she "really just ha[d] no memory at all" as to whether she looked into obtaining a false-confessions expert. (*Id.*) Petitioner states that her "ignorance of a point of law," "combined with her failure to perform," "is a quintessential example of unreasonable performance under Strickland." (*Id.*)

In his petition for post-conviction relief, Petitioner argued that an expert would have "provided explanation for *why* a person might make a false confession or the circumstances that make false confessions more likely[.]" (Doc. No. 12-16 at 91 (emphasis in original)). In addition, Petitioner asserted that "where there was zero evidence to corroborate the child's statements, a "false confessions expert would have been an educational witness that would have provided the jury with an alternative explanation regarding why" Petitioner "would make statements that he later denied." (*Id.*)

During the evidentiary hearing on his petition for post-conviction relief, Petitioner's counsel tendered Professor Alan Hirsch as an expert in the field of false confessions. (Doc. No. 12-18 at 2:2–4; *see id.* at 21:14–17). The TCCA summarized his testimony as follows.

> Professor Alan Hirsch testified that he was a criminal justice professor at Williams College and specifically focused on the area of interrogations and confessions. He stated that he was in the class of experts "whose principal expertise is in the interrogation methods that contribute to false confessions."
>
> Professor Hirsch was admitted as an expert in this area. He testified generally to the published literature on "false confessions" and the conditions present when a confession is proven as false. He testified about the "Reid method" of interrogation, which often leads to

58

"false confessions." He also testified to the methodology used to establish the reliability of a confession. For the Petitioner's case, Professor Hirsch prepared a sworn expert affidavit based on reading the transcript of the recorded conversation between the Petitioner and the victim's mother during which the Petitioner admitted to the sexual abuse. Based on his reading of the transcript of their conversation Professor Hirsch identified examples of "confrontation" and "minimalization" on the part of the victim's mother that occurred throughout their conversation and could have led the Petitioner to falsely confessing to the crimes. He testified about several more examples in their conversation when the victim's mother said things that would have pushed the Petitioner into falsely confessing.

On cross-examination, Professor Hirsch acknowledged that his affidavit conceded that the victim's mother was not a member of law enforcement. He agreed that he could not state with certainty that the Petitioner's confession was unreliable or false.

*Sanders*, 2020 WL 2394992 at *3–4.

Ms. Harrison, one of Petitioner's trial attorneys, testified during the evidentiary hearing. She recalled the body-wire conversation between Ms. Standberry and Petitioner, and she acknowledged that she "litigated that issue pretrial" "[q]uite a bit." (Doc. No. 12-18 at 52:1–7). When post-conviction counsel asked her if she was aware about the existence of false confessions experts, she testified, "I really don't remember. I would assume that I knew about false confessions, but I don't really remember." (*Id*. at 10–12). She also could not recall whether she looked into getting a false confessions expert. (*Id*. at 52:13–18).

On cross-examination, she testified that her primary goal when she initially received the case was to get Petitioner's statements to Ms. Standberry suppressed. (*Id*. at 59:5–12) (stating that "that was the focus at the beginning" and "[w]e went pretty heavily into a suppression motion")); *see Sanders*, 2020 WL 2394992 at *4. Once the trial court denied Petitioner's motion to suppress, she explained that her trial strategy was to attempt to impeach A.S. (Doc. No. 12-18 at 59:18–19). However, she explained that doing so could be "tricky" because she did not want to anger the jury

by "going after" the child. (*Id*. at 59:20–22). Her strategy was also to cross examine Ms. Standberry "as aggressively as possible," particularly about the conversation she had with Petitioner during the April 24, 2008 body-wire conversation. (*Id*. at 59:18–24). She indicated that had Petitioner asked her to get a false confessions expert, she "would've tried." (*Id*. at 60:19–22).

The post-conviction court denied this claim because it determined that Petitioner failed to establish trial counsel was deficient or that he suffered prejudice due to trial counsel's alleged error. (Doc. No. 12-17 at 19–20). As to the prejudice component, the trial court explained that "the types of questions Mr. Hirsch would have advised defense counsel to ask the victim's mother[] [Ms. Standberry] at trial were addressed by the Trial Counsel during her cross-examination. (*Id*. 18 (citing Trial Tr., vol. I, at 139-47)).

The TCCA found that the evidence did not preponderate against the post-conviction court's findings:

> Petitioner did not demonstrate prejudice because of the lack of expert witness on this subject. Counsel's strategy on cross-examination elicited responses from the victim's mother largely similar to that which Mr. Hirsch provided his expert opinion regarding the potential falsity of the Petitioner's confessions. As such, had Mr. Hirsch or another expert been called as a witness, the Petitioner has not shown that the outcome of his trial *would have been different*, as the subject matter of his testimony was in essence heard and considered by the jury. The Petitioner is not entitled to relief.

*Sanders*, 2020 WL 2394992 at *9 (emphasis added).

As an initial matter, the Court notes that, at first blush, the TCCA's recitation of *Strickland*'s prejudice standard reads as holding Petitioner to a higher burden of proof. *See Strickland*, 466 U.S. at 697 ("With regard to the prejudice inquiry, only the strict outcome-determinative test, among the standards articulated in the lower courts, imposes a heavier burden on defendants than the tests laid down today."). *Strickland*, for example, only requires a showing

that "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different"—not a showing that the outcome of the trial *would have* been different. *Id*. at 694; *see Vasquez v. Bradshaw*, 522 F. Supp. 2d 900, 931 (N.D. Ohio 2007) ("[Petitioner]'s burden under *Strickland* is not to show that the outcome of his trial *would have been* different . . . . Instead, Vasquez [petitioner] is only required to show a 'reasonably probability' that the outcome would have been different but for [counsel]'s errors." (emphasis in original)).

However, the Supreme Court has cautioned federal habeas courts against "readiness to attribute error" to state-court decisions, especially when, as here, a state court properly framed the inquiry "by setting forth the 'reasonable probability' criterion" elsewhere in its opinion. *Woodford v. Visciotti*, 537 U.S. 19, 22, 24 (2002); *see Stefanski v. Douglas*, No. 23-1881, 2024 WL 1956213, at *6 (6th Cir. May 3, 2024) (stating that "an occasional imprecise or incorrect articulation of federal law does not run afoul of AEDPA if the state court otherwise properly discussed the governing law") (citing *Visciotti*, 537 U.S. at 23–24)). In analyzing Petitioner's ineffective-assistance-of-counsel claims, the TCCA correctly framed the prejudice inquiry under *Strickland* as follows:

> [T]he petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

*Sanders*, 2020 WL 2394992 at *7. For this reason, and because neither of the parties address the TCCA's imprecise wording, the Court presumes that the TCCA analyzed Petitioner's claim under the proper standard that it first articulated in its opinion. *See Holland v. Jackson,* 542 U.S. 649,

654–55 (2004) ("As we explained . . . , § 2254(d) requires that state-court decisions be given the benefit of the doubt . . . . [R]eadiness to attribute error is inconsistent with the presumption that state courts know and follow the law." (internal quotation marks and citation omitted)); *see also Daniel v. Curtin*, 499 F. App'x 400, 413 n.5 (6th Cir. 2012) ("[B]ecause the issue has not been raised by the parties, we conclude that despite the Michigan court's imprecise language, the court was considering [petitioner]'s *Strickland* claim under the proper standard that it first articulated in its opinion." (citing *Holland*, 542 U.S. at 654–55)).

In addition, the state court's determination that Petitioner failed to establish prejudice was not "contrary to" or "an unreasonable application of" *Strickland.* 28 U.S.C. § 2254(d). Under *Strickland*, "the likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693); *cf. Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("In order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way-in strength and subject matter-from the evidence actually presented at sentencing."). In the failure-to-hire context, the Sixth Circuit has held that a habeas petitioner failed to establish prejudice under *Strickland* when the "difference between the jury hearing th[e] theory of defense through cross-examination and hearing it through the mouth of another expert" was "modest." *Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005) ("The question here is whether Hellings [trial counsel] was required to obtain an expert of his own or whether it sufficed to subject the prosecution's expert to cross-examination.").

Dr. Hirsch testified that his role at trial would have been "to provide general educational background on about what is known about confessions and interrogation," and "to explain how facts in a particular case might be germane to that analysis." (Doc. No. 12-18 at 35:20–25). He stated that he would have explained to the jury that the tactics Ms. Standberry used were

"unreliable." (*Id*. at 35:1-4). On cross-examination, he stated that if he was advising counsel "about the cross-examination of" Ms. Standberry at trial, he would want to know "the extent to which she was instructed to pursue these lines of questioning." (*Id*. at 47:3-7). He testified that he would want to ask the following questions:

> [I]sn't it true that you weren't going to take no for an answer?
>
> You weren't really trying to find out whether he had done it, were you? You were trying to get him to confess. Wasn't that your sole purpose?

(*Id*. at 47:7–11).

But as the post-conviction court recognized, (Doc. No. 12-7 at 18), the questions Dr. Hirsch posed at the post-conviction hearing are akin to those that Ms. Harrison posed to Ms. Standberry at trial. At trial, Ms. Harrison, for example, on cross-examination, pressed Ms. Standberry on the number of times she demanded a confession from Petitioner, the number of times Petitioner denied criminal activity, and the "tactics" she used during the April 24, 2008 body-wire conversation. (Doc. No. 12-4 at 144–46). She further questioned her on whether law enforcement instructed her on which questions to ask Petitioner. (*Id*. at 143:9–13). The difference between the jury hearing this evidence through cross-examination of the state's witnesses and hearing it through Dr. Hirsch is modest, at best, and insufficient to establish prejudice under *Strickland*. *See Tinsley*, 399 F.3d at 806. The state courts, therefore, reasonably could have concluded Petitioner failed to meet his burden of establishing prejudice under *Strickland*.

Accordingly, the state court's rejection of this claim, based on the record before it, was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

63

2. Ground 5: Failure to Object to Prosecutor's Comments

Petitioner claims that his trial counsel was ineffective for failing to object to the prosecutor's "improper comment[s]." (Doc. No. 1 at 24). There are four instances of misconduct that Petitioner claims his trial counsel should have objected to, and all the alleged misconduct relates to commentary the prosecutor made during closing argument. (*Id*. at 24-27). In his petition for post-conviction relief, Petitioner framed each of these instances of misconduct, as he does in his Petition, in the following way:

- Comment about defendant's right to remain silent;
  During Closing Argument, the State comments on his duty to provide medical proof of any illness that [he] might have[.] [The prosecutor stated,] "He didn't offer to bring medical proof to them and say I couldn't possibly have done these things because I'm not capable of it." (Trial R. Vol. II, p. 279.)

- Comment vouching for A.S. credibility;
  "The kid is honest, and she is telling you what happened to her in her everyday life at home or she's not." (Trial R. Vol. II, p. 281.) "The second reason I feel like we can believe — I'm asking you to believe [A.S.] . . ." (Trial R. Vol. II, p. 296.)

- Comment about making public service announcements and the need to believe children to send a message;

  > I ran across a PSA, a public service announcement. And it was about a two minute PSA, and it was put out by one of the national child abuse prevention organizations. It's aimed at children who are caught - - directly for children who are caught in abusive situations. And the message of that PSA can be distilled down into two words and was distilled down ultimately into two words that they flashed across the screen at the end. And those two words are 'tell someone'. The implication, of course, being that if you're a child being abused, tell someone and they'll believe you. You'll be protected, your abuse will stop, your abuser will be held accountable. And I was thinking about that last night as I was thinking about this section of my remarks. Because what occurred to me was what that PSA does not say is "tell

64

someone but." If you really want to be believed, protected, have your abuser held accountable, try and make sure you don't come from a chaotic situation at home because they'll use that against you. Or tell someone, but you better hope you have a competent DCS worker because otherwise your case is going to have problems. Or tell someone, but be sure to tell the story exactly the same way every time and be sure to remember to throw a lot of details in and be able to talk graphically about what happened to you in front of a bunch of strangers three years later. If you can do all of those things, go ahead and tell someone. Otherwise don't bother. That's not what we tell our children, ladies and gentlemen. That is not what children have a right to expect from us. [A.S] told someone, and it's now time to hold her abuser accountable. (Trial R. Vol. II, p. 294–95.)

- Comment about defendant's statements, which were not in evidence;
  During its first Closing Argument, the State of Tennessee tells the jury that when . . . [Petitioner] states one thing in the undercover recording with [A.S.]'s mother, he *really* means another – even though there was no evidence of his alleged thoughts.

  You know, he owns up to all of that when he's talking to Latrice. He says specifically – she says, so were you playing or was it a touch. It was a touch. It was a touch. So you know, when I said I accidentally let m[y] finger slip inside of her while she was wearing her nightgown, what I meant to say is I intentionally touched her, I intentionally penetrated her genital opening. I intentionally raped her. I'm intentionally guilty of rape of a child. (Trial R. Vol. II, pp. 281–82.)

(Trial R. Vol. II, pp. 281-82.) This was intended to inflame the jury and prejudice them against Mr. Sanders, encouraging them to view him in the most despicable manner possible. In the second Closing, the State continues to attribute thoughts and statements of Mr. Sanders which were not in evidence: "He says to Detective Mayo, I'm a good —I'm good to that family, I buy them things. But unsaid, they're the type of people who would make this up about me." (Trial R. Vol. II, p. 299.)

65

(Doc. No. 12-16 at 97–98).

During the evidentiary hearing, Petitioner's post-conviction counsel did not question Petitioner's trial counsel on her alleged failure to object to the above commentary during closing argument. (*See* Doc. No. 12-18 at 50–58). However, on cross-examination, the state questioned trial counsel as to whether her failure to object during closing argument could have been a tactical decision:

> Q.  And then as it relates to closing arguments, do you, would that have been a tactical decision not to object in the closing?
>
> A.  I think it probably would have. I don't recall whether I objected to other things. I mean I've read the petition and it[] just [h]as the things I didn't object to. I don't typically object a lot to a closing argument, but I do if I think I need to.

(*Id*. at 60:10–18).

On redirect, Petitioner's post-conviction counsel followed up on this line of questioning:

> Q.  Ms. Harrison, you said that you believed that part of not objecting in closing might've been strategic, is that correct?
>
> A.  Yes.
>
> Q.  Having looked and reviewed the closing argument, is that still your position today?
>
> A.  I don't know if I have a strong position today. I mean I don't really remember very well. I had about ten minutes to look at this, so I'm not really sure. I don't think I could make a determination about what I should and shouldn't have done.

(*Id*. at 61:2–13).

The post-conviction court addressed each comment separately and explained its reasoning for denying each claim. The Court will incorporate its reasoning, as well as the TCCA's, in its analysis below.

66

a. <u>Applicable Law</u>

Trial counsel's failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel. *Stermer*, 959 F.3d at 737. When faced with a claim that trial counsel was ineffective for failing to object to prosecutorial misconduct during closing argument, the Sixth Circuit has explained that "[o]n habeas review, a court's role is to determine whether [alleged prosecutorial misconduct] was so egregious as to render the entire trial fundamentally unfair." *Millender v. Adams*, 376 F.3d 520, 526 (6th Cir. 2004) (citations omitted). "In conducting such a determination, a reviewing court *first* decides whether the alleged misconduct was improper and, if it was, then decides whether the misconduct was so flagrant as to constitute a denial of due process and warranting granting a writ." *Id.* (emphasis added) (internal quotation marks and citations omitted); *see Faulk v. Woods*, No. 09-cv-14130, 2013 WL 388588, at *16 (E.D. Mich. Jan. 31, 2013) (explaining that if the instances of misconduct that a petitioner claims "should have been objected to were either not misconduct or [were] insufficiently serious[,] . . . [they] do not form the basis for a claim of ineffective assistance of counsel" (citing *Donaldson v. United States*, 379 F. App'x 492, 493 (6th Cir. 2010))).

The Sixth Circuit has considered the following factors when assessing flagrancy: (1) whether the prosecutor's conduct tended to mislead the jury or prejudice the accused, (2) whether it was isolated or extensive, (3) whether it was deliberate or accidental, and (4) the strength of the evidence against the defendant. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). "[T]he first of these factors incorporates a consideration of whether the trial judge gave an appropriate cautionary instruction to the jury." *Gumm v. Mitchell*, 775 F.3d 345, 381 (6th Cir. 2014) (internal quotation marks and citation omitted). In addition, when assessing these factors, a "'court must view the

totality of the circumstances.'" *Id.* (quoting *Hanna v. Price,* 245 F. App'x. 538, 544 (6th Cir. 2007)).

If the misconduct is improper and flagrant, the court must then determine whether trial counsel's failure to object to the prosecutorial misconduct amounted to deficient performance and prejudiced the petitioner under *Strickland. See, e.g.*, *Walker v. Morrow*, 458 F. App'x 475, 487–92 (6th Cir. 2012) (analyzing the petitioner's ineffective-assistance-of-counsel claim based on the petitioner's failure to object to prosecutorial misconduct). In addressing deficient performance in the failure-to-object context, the Sixth Circuit has explained:

> As a threshold matter, in a trial of any size, numerous potentially objectionable events occur. "[T]he Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac,* 456 U.S. 107, 134, 102 S. Ct. 1558, 71 L.Ed.2d 783 (1982). Moreover, experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. Learned counsel therefore use objections in a tactical manner. In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.

*Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006).

In this vein, the Sixth Circuit has found trial counsel's failure to object to prosecutorial misconduct amounts to deficient performance in particularly egregious scenarios. *See, e.g.*, *Stermer v. Warren*, 360 F. Supp. 3d 639, 655 (6th Cir. 2018) (concluding that trial counsel's failure to object to the prosecutor's "repeated attacks on" the defendant amounted to deficient performance under *Strickland*); *Hodge v. Hurley,* 426 F.3d 368, 376 (6th Cir.2005) ("[C]ounsel's failure to object to *any* of the numerous improper statements in the prosecution's closing argument is well outside [professional norms]." (emphasis in original)).

68

b. <u>Analysis</u>

i. <u>Comment 1: Right to Remain Silent</u>

As to comment one, the post-conviction court found that Petitioner failed to meet his burden of proving ineffective assistance of counsel for the following reasons. (Doc. No. 12-17 at 36). It explained that, contrary to Petitioner's contention, the prosecutor's commentary was not about his right to remain silent. (*Id*. at 35). Instead, it stated that it was "a comment about the proof before the jury." (*Id*.) It summarized the relevant portion of the commentary based on the trial transcript:

> Prosecutor: [Petitioner told Ms. Standberry that he] lost the urge for sex before [] [she] even had J[.S]., I've got diabetes. So we have diabetes and colon cancer, both of which are keeping him from being able to do this [abuse A.S.]. Remember those aren't things he said to the police when he was interviewed. He didn't offer *to bring medical proof* to them and say I couldn't possibly have done these things because I'm not capable of it.

(*Id*. (emphasis added)).

The court, however, still found the prosecutor's commentary regarding medical proof "inappropriate" because the state, not a defendant, has the burden of proving a defendant's guilt beyond a reasonable doubt. (*Id*. at 35). It, nonetheless, determined that Petitioner failed to meet "his burden on this issue" because (1) Petitioner's defense counsel *did* object to this commentary, and (2) the trial court provided a curative instruction to the jury to "rely upon your memory instead of what the attorneys say." (*Id*. (citing Trial Tr. vol. II, at 279–80)). The TCCA agreed with the post-conviction court's rejection of this claim, stating that the evidence "d[id] not preponderate against these findings." *Sanders*, 2020 WL 2394992 at *11.

When, as here, a petitioner claims that a prosecutor improperly commented on his right to remain silent, a court "should consider" the following factors: whether (1) the comments were

manifestly intended to reflect on the accused's silence or are of such a character that the jury would "naturally and necessarily" construe them as such; (2) the comments were isolated or extensive; (3) there was otherwise overwhelming evidence of guilt; and (4) appropriate curative instructions were given. *United States v. Wells*, 623 F.3d 332, 338 (6th Cir. 2010) (citation omitted). In addition, "[r]eversal based on a prosecutor's improper indirect comment on a defendant's silence requires one of two findings: manifest intent to comment on the failure to testify; or the remark was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Id.* at 338–39 (internal quotation marks and citations omitted).

Here, the post-conviction court reasonably could have concluded that the prosecutor's comment on medical proof was not, either directly or indirectly, a comment on Petitioner's right to remain silent. "An examination of the prosecutor's comment in context of the trial and the rest of her closing argument is necessary to determine whether there is an explanation for it that is equally plausible with [Petitioner]'s assertion that it was a reference to his silence." *Wells*, 623 F.3d at 339. The prosecutor's commentary was part of a broader discussion of Petitioner's statements to Ms. Standberry during the body-wire conversation. (Doc. No. 12-17 at 35 n.16). During closing argument, the prosecutor referenced to the statements Petitioner made to Ms. Standberry to show that he, unlike A.S., had offered "different excuses for what had happened." (Doc. No. 12-5 at 82:18). The commentary leading up to the prosecutor's statements that Petitioner failed to bring medical proof is as follows:

> Prosecutor:     [W]hat is the proof that you have to consider? What are the things that A[.S.] Standberry told you from the stand? . . . . [A.S.] says, he climbs on top of me and moves back and forth and he touches these other parts of my body and this greasy stuff comes out of his private part when he does that. How could she possibly know about that unless she had experienced it herself? She certainly wasn't watching videos and picking up on the texture of semen. There wasn't proof

70

> she had education of that otherwise. She experienced that
> because of what the defendant, Mr. Sanders, was doing to
> her. She didn't offer eighteen different excuses for what had
> happened. The defendant on the other hand offered several.

(Doc. No. 12-5 at 80:19–21; *id*. at 82 (closing argument)).

The prosecutor then referenced to Petitioner's statements to Ms. Standberry during the body-wire conversation that he had diabetes and was diagnosed with colon cancer, and consequently, had "lost the urge for sex." (*Id*. at 83:17). The prosecutor, during closing argument, characterized Petitioner's statement to Ms. Standberry as excuse "Number seven." (*Id*. at 83); *see* Doc. No. 12-7 at 23–24 (explaining he did not have the "urge for sex" due to his cancer)). The prosecutor continued:

> So we have diabetes and colon cancer, both of which are keeping
> him from being able to do this [abuse A.S.]. Remember those aren't
> things he said to the police when he was interviewed. He didn't offer
> *to bring medical proof* to them and say I couldn't possibly have done
> these things [to A.S.] because I'm not capable of it.

(Doc. No. 12-5 at 83:20–24 (emphasis added)).

Accordingly, when viewing this commentary in context, the prosecutor's statement that Petitioner failed "to bring medical proof" of his physical ailments was simply not a comment on Petitioner's silence. (*Id*.) Stated another way, it was not of "of such character that the jury would naturally and necessarily take it to be a comment on" Petitioner's right to remain silent. *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981) (internal quotation marks and citation omitted). Rather, this comment was part of a broader discussion as to why A.S.—one of the prosecution's primary witnesses—was more credible than Petitioner based on the proof at trial, i.e., the body-wire conversation.

In addition, even assuming that the prosecutor's comment was improper, the record belies Petitioner's contention that trial counsel failed to object to this commentary; as the post-conviction

/ 1

court observed, trial counsel *did* object to the statement that Petitioner failed to bring medical proof, and she did so on the basis that "[t]hat was not the testimony" at trial. (Doc. No. 12-5 at 83:25; *id*. at 84:1; *see* Doc. No. 12-17 at 34). The trial court then immediately provided a curative instruction to the jury: "Okay. The jury will remember the testimony and upon your memory instead of what the attorneys say." (*Id*. at 84:2–4); *see Gumm*, 775 F.3d at 381 (considering "whether the trial judge gave an appropriate cautionary instruction to the jury" when assessing flagrancy of a prosecutor's misconduct); *see also United States v. Galloway*, 316 F.3d 624, 633 (6th Cir. 2003) (stating that a curative instruction, to be sufficient, "must be swift and in proportion to the potential harm"). Petitioner simply ignores this evidence in the record.

For these reasons, the state court's conclusion that Petitioner failed to meet his burden of proving ineffective assistance of counsel based on his trial attorney's failure to object was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

  ii.  Comment 2: Vouching for A.S.

As to comment two, the post-conviction court found that "it is inappropriate for a prosecutor to vouch for the victim's credibility, and the prosecutor erred here when she stated, 'The kid is honest . . . .'" (Doc. No. 12-17 at 36). Nonetheless, it determined:

> In the context of this particular case, . . . the Court does not find this error rises to the level of prosecutorial misconduct warranting a new trial. The Court reiterates it is the court's practice to advise jurors repeatedly that statements of counsel are not evidence. Particularly, prior to deliberation, the Court instructs jurors that they are the "exclusive judges of the credibility of the witnesses and the weight to be given to their testimony." (Trial Tr., vol. II, at 310-11; Jury Charge, at 6). The Court finds the Petitioner has not met his burden on this issue.

(Doc. No. 12-17 at 36).

On appeal to the TCCA, Petitioner renewed his argument that trial counsel was ineffective for failing to object to the prosecution's commentary. As to the prejudice component, Petitioner argued:

> The prosecution made repeated improper comments intended to inflame the jury and prejudice them against Mr. Sanders, encouraging them to view him in the most despicable manner possible . . . . Both prosecutors told jurors they either "believed" A.S. or she was "honest."
>
> Every trial is different. In a theft trial, the arguments of the parties are significantly less susceptible to inflamed passions and prejudices. But multiple counts of child rape and aggravated sexual battery are inherently different. Counsel's failure to object fell below the standards demanded of effective counsel, resulting in prejudice to Mr. Sanders. As previously stated, the proof is [sic] this case was not overwhelming[]. There was absolutely no physical evidence. Mr. Sanders' statements were only elicited after significant promises and threats were made and, his "admissions" did not corroborate the accusations made by A.S. After the initial interrogation by Ms. Standberry, Mr. Sanders twice denied the allegations. Trial counsel's failure to object cannot be excused.

(Doc. No. 12-25 at 78). Petitioner also devoted a portion of his brief to discussing the Sixth Circuit's decision in *Hodge*. (*Id*. at 75–76). Petitioner explained that, in *Hodge*, "the Sixth Circuit reversed [the petitioner]'s conviction based on prejudice from "'his counsel's myriad failures to object to the prosecutor's misconduct.'" (*Id*. at 76 (quoting *Hodge*, 426 F.3d at 386)).

The TCCA, however, agreed with the post-conviction court's determination that trial counsel's failure to object was strategic:

> The evidence does not preponderate against these findings. Counsel testified that she decided not to object during the State's closing argument if she did not think it was necessary. We note the long-standing principle that the State and the defense are allowed wide latitude in arguing their cases to the jury during closing arguments. *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1994). In light of this latitude, Counsel chose to object at one point during the State's argument but otherwise made the strategic decision not to interrupt

any further. Particularly in light of the rules governing closing arguments, we will not second guess Counsel's strategy[.]

*Sanders*, 2020 WL 2394992 at *11. And although the TCCA did not squarely address *Hodge* or Petitioner's arguments that he was prejudiced by trial counsel's failure to object, it concluded:

> [N]or has the Petitioner established that, had she objected to the various aspects of the State's argument, the jury would have returned a different verdict.

*Id*.

Notwithstanding the TCCA's failure to meaningfully address some of Petitioner's arguments, the Court is mindful that it must still "presume (subject to rebuttal) that th[is] federal claim was adjudicated on the merits," which means the AEDPA's "restrictive standard of review" applies. *Johnson v. Williams*, 586 U.S. 289, 293 (2013). Petitioner makes no attempt to rebut this presumption, and the Court therefore will apply the AEDPA's highly deferential standards of review.

Ordinarily, "[i]t is patently improper for a prosecutor to . . . comment [or vouch] on the credibility of a witness[.]" *Hodge*, 426 F.3d at 378 (citing *United States v. Young*, 470 U.S. 1, 17–19 (1985)). The Supreme Court in *Young* explained the dangers of a prosecutor's vouching for the credibility of witnesses:

> [S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*Id*. at 470 U.S. at 18–19. Improper vouching involves blunt comments or "special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999) (citation omitted).

74

Here, the prosecutor's statements—that A.S. "is honest" and "I feel like we can believe [A.S.]"— verge on improper vouching when viewed in isolation because they read as personal beliefs regarding A.S.'s credibility. *See Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012) ("It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying." (internal quotation marks and citations omitted)). But even assuming these comments were improper, the record does not support that, when viewing them in their context, they were "so flagrant as to require reversal." *Gumm*, 775 F.3d at 383.

Again, a court must examine "the prosecutor's comment in context of the trial and the rest of her closing argument." *Wells*, 623 F.3d at 339. The prosecutor's statement that A.S. "is honest," when read in context of the trial and the rest of closing argument was tied to the record evidence relating to Ms. Standberry. *See Cleveland v. Bradshaw*, 65 F. Supp. 3d 499, 532–33 (N.D. Ohio 2014) (determining that the prosecutor's statements were not flagrant because they were "tethered to the record evidence and d[id] not have the appearance of originating from the prosecutor's personal opinion or evidence outside that presented to the jury").

At trial, defense counsel elicited testimony during cross-examination of Ms. Standberry in which she could not recall whether she had struck A.S. with a hairbrush. (Doc. No. 12-4 at 138:23–24). This testimony was inconsistent with A.S.'s in which she testified on that Ms. Standberry *did* strike her with a hairbrush. (*Id*. at 84 at 17–19). The prosecutor's commentary during closing argument, leading up to her statement that A.S. "is honest" is as follows.

> You know, there's been all this stuff about Latrice Standberry, maybe she hit her daughter. I think it's ironic the defense wants you to believe her little girl when she says that Ms. Standberry hit her, but she doesn't want you to believe the little girl when she says Mr. Sanders raped her. You can't have it both ways really. *The kid is*

75

> *honest*, and she is telling you what happened to her in her everyday
> life at home or she's not.

(Doc. No. 12-5 at 85:3–11 (emphasis added)). The prosecutor's statement that A.S. "is honest" is therefore in reference to the trial evidence, and this statement, therefore, does not have the appearance of deliberately misleading the jury to facts outside the record. *See Boyle,* 201 F.3d at 717 (considering whether misconduct is deliberate or accidental). The post-conviction court, therefore, reasonably could have concluded that this statement, although improper, did not "ris[e] to the level of prosecutorial misconduct warranting a new trial." (Doc. No. 12-17 at 35).

In addition, the prosecutor's statement that "I feel like we can believe" A.S. was in rebuttal to defense counsel's closing argument. (Doc. No. 12-5 at 100:21–22). When, as here, a petitioner alleges a prosecutor's comments in rebuttal are improper, the Supreme Court in *Young* has considered whether "defense counsel's comments clearly invited the reply." 470 U.S. at 11(internal quotation marks and citation omitted). It explained that:

> In order to make an appropriate assessment, the reviewing court
> must not only weigh the impact of the prosecutor's remarks, but
> must also take into account defense counsel's opening salvo. Thus
> the import of the evaluation has been that if the prosecutor's remarks
> were 'invited,' and did no more than respond substantially in order
> to 'right the scale,' such comments would not warrant reversing a
> conviction.

*Id.* at 12–13.

During closing argument, defense counsel summarized "inconsistencies" between A.S. and Ms. Standberry's testimonies. (Doc. No. 12-5 at 88:7). During one portion of closing argument, defense counsel illuded to potential reasons for A.S. to lie about the allegations against Petitioner based on her trial testimony The prosecutor stated:

> What do we know from A[.S.] . . .We know that A[.S.] was scared
> of her mother. We know that A[.S.] felt that her mother was the only
> thing she had in the world and that she would do whatever her

76

> mother told her. If you remember, I asked A[.S]. if she would try to do whatever her mother told her. And she actually said to me, no, I wouldn't try, I would just do it.

(*Id*. at 88:10–21). When reading the statement, "I feel like we can believe [A.S.]," in context, the prosecutor was referring to A.S.'s supposed motive to lie about the abuse:

> The second reason *I feel like we can believe* – I'm asking you to believe A[.S.], second category I want you to think about, is her motive to lie. There is none, ladies and gentlemen. You heard no motive in the proof, that A[.S.] had some reason to make up a story . . . . We have no proof whatsoever that Latrice or anybody manipulated her into lying.

(*Id*. at 100:21–22; *id*. at 101:1, 7–8 (emphasis added)).

"[T]he line separating acceptable from improper advocacy is not easily drawn." *Young*, 470 U.S. at 7. However, the prosecutor's statement that "I feel like we can believe" A.S. (Doc. No. 12-5 at 100:20–21), when viewing it in the context closing argument, can be read as "response[s] to defense counsel's [closing] argument[]," *Gumm*, 775 F.3d at 383. In addition, Petitioner offers no explanation as to how the prosecutor's comments vouching for A.S.'s credibility, when viewing them in the context of trial and closing argument, fell so "out of bounds" to warrant a new trial. *Young*, 477 U.S. at 13. Nor does Petitioner point elsewhere in the record where the prosecutor improperly vouched for A.S.'s credibility. Any improper vouching, therefore, was, by all appearances, limited to closing argument. *See Wilson v. Bell*, 368 F. App'x 627, 635 (6th Cir. 2010) ("[T]he misconduct was not extensive, as it was confined to rebuttal and was a single isolated remark."); *id*. at 636 (determining that trial counsel's failure to object to "this isolated instance of vouching was not objectively unreasonable").

Also, although Petitioner relied on *Hodge* in his appellate brief in arguing that the prosecutor's improper vouching prejudiced him, this Court, notwithstanding some factual similarities, finds *Hodge* distinguishable from Petitioner's case. In *Hodge*, the petitioner was

77

convicted of rape of a child under thirteen years of age. 426 F.3d at 371. The Sixth Circuit determined that trial counsel's "myriad failures to object to the prosecutor's misconduct" amount to deficient performance and prejudiced the petitioner. *Id*. at 386. In addressing deficiency, the Sixth Circuit observed that defense counsel failed "to object to *any* aspect of the prosecutor's egregiously improper" conduct and stated that it was "unable to articulate a sound professional reason why defense counsel did not object to this pattern of *repeated* misconduct." *Id*. at 376, 386 (emphasis added). In concluding that the petitioner was prejudiced by "his counsel's myriad failures to object," the Sixth Circuit determined that "[t]he lack of physical evidence confirming sexual activity meant that this was necessarily a close case at the trial level." *Id*. at 386. Accordingly, "a failure to object to prosecutorial misconduct calculated to cast Hodge [the petitioner] in a negative light . . . [wa]s particularly likely to affect the jury's verdict." *Id*. at 387.

Although, like *Hodge*, this case also turned on witness credibility because there was no physical evidence that A.S. was sexually abused, the prosecutor's vouching in Petitioner's case was, again, limited to two statements during rebuttal closing argument. *See Hodge*, 426 F.3d at 384 (noting that the prosecutor commented during opening statement that the petitioner was "one of those people' who needed to have sex with children"—a "formulation" that did not appear accidental because the prosecutor "*repeated* it" during closing argument (emphasis added)); *id* at 389 ("[I]n a trial where the result depended almost entirely on the jury's determination as to whether Hodge or Fenn [the victim's mother] was more credible, the failure to object to these comments was highly prejudicial."). Moreover, unlike defense counsel in *Hodge*, Petitioner's defense counsel did not fail to object to *any* aspect of the prosecutor's statements during trial or closing argument. (*See* Doc. No. 12-4 at 21–22, 55 (objecting on grounds of leading witness); *id*. at 128:7 (objecting on hearsay grounds); *id*. at 130:24 (objecting on hearsay grounds); *id*. at 148:3–

78

4 (objecting on mischaracterization of witness testimony); *id*. at 191:23–24 (objection based on lack of personal knowledge); *id*. at 199:10–13 (objecting to expert-witness testimony); *id*. at 200:16–23 (same); *see also* Doc. No. 12-5 at 83:25 (objecting during closing argument); *id*. at 97:21 (same)). At least one objection prompted an instruction from the trial judge during closing argument that "[t]he jury will remember the testimony and rely upon your memory instead of what the attorneys say." (Doc. No. 12-5 at 84:2–4); *see Romano v. Okla.*, 512 U.S. 1, 13–14 (1994) (concluding that a prosecutor's misconduct did not warrant reversal because the trial court provided clear instructions to the jurors).

On the record before it, the state court's conclusion that the prosecutor's "error [did not] rise[] to the level of prosecutorial misconduct warranting a new trial," (Doc. No. 12-17 at 36), was therefore not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103.

### iii. Comment 3: "Sending a Message" or "PSA" Comment

The post-conviction court found that comment three did not amount to prosecutorial misconduct and, even if it did, that Petitioner failed to meet his burden of proving ineffective assistance of counsel. (Doc. No. 12-17 at 37, 39–40). The post-conviction court explained:

> The excerpts from the rebuttal argument characterized in the amended petition as comments about "sending a message" must be considered in the context of the case. The defense theory was the victim was untruthful and had made false allegations against the Petitioner. This theory was articulated during the defense's opening statements (Trial. Tr., vol. I, at 25), the cross-examination of the victim and particularly the victim's mother (*id*. at 137-47), and closing argument (*id*. at 284-86, 289). The statements made by the State during the rebuttal closing were in direct response to statements made by the defense throughout the trial and during the defense's closing argument. When considering the totality of circumstances, the District Attorney General's comments made during her rebuttal closing do not constitute prosecutorial

79

> misconduct, and the Court finds the Petitioner has not met his
> burden on this issue.

(*Id*. at 37). In addition, the post-conviction court concluded that the "Petitioner did not present any evidence at the post-conviction hearing to suggest Trial Counsel's failure to object" to this statement was "anything but a tactical decision." (*Id*. at 39–40).

Petitioner does not explain in his Petition how this commentary is flagrant. (*See* Doc. No. 1 at 24–27 ). However, on appeal, he argued that this comment was "[p]erhaps the most egregious of all the comments" because the "[j]urors were specifically encouraged to find Mr. Sanders guilty to send a message that children that come forward must be believed no matter the circumstances — especially A.S." (Doc. No. 12-25 at 78). In explaining that he was prejudiced by the prosecutor's statement, he argued:

> As previously stated, the proof is [sic] this case was not overwhelming[]. There was absolutely no physical evidence. Mr. Sanders' statements were only elicited after significant promises and threats were made and, his "admissions" did not corroborate the accusations made by A.S. After the initial interrogation by Ms. Standberry, Mr. Sanders twice denied the allegations. Trial counsel's failure to object cannot be excused.

(*Id*.) The TCCA, however, rejected Petitioner's claim, finding that the "evidence d[id] not preponderate against" the post-conviction court's findings. *Sanders*, 2020 WL 2394992 at *11.

As the post-conviction court observed, comment three was also made in rebuttal closing argument. As this Court explained in the previous section, the Supreme Court in *Young* has considered whether "defense counsel's comments clearly invited the reply" when determining whether a prosecutor's remarks are so flagrant to warrant a new trial. 470 U.S. at 11, 20. A court must "take into account defense counsel's opening salvo." *Id*. at 12–13.

During closing argument, defense counsel highlighted the "huge inconsistencies in the stories of the State's primary two witnesses," A.S. and Ms. Standberry. (Doc. No. 12-5 at 88:8–9). Defense counsel stated:

> [The prosecutor] asked you to use your common sense in deciding who to believe in this case. I say the same. And what do we look at when we're trying to look at what to believe? We look at are there inconsistencies in the stories of the witnesses. And I submit to you that we have huge inconsistencies . . . . I'm not trying to have it both ways. I am just trying to tell you that we don't know who is lying here . . . . What other inconsistencies do we have? We have the fact that A[.S.] testified that she did -- that she did go over to the to the defendant's house after he moved out. We have Latrice Standberry saying she doesn't know of a reason why A.[S.] would go over there after Henry moved out. Again, we have an inconsistency, and we don't know who is lying. Do you want to convict someone beyond a reasonable doubt when you're not sure?

(*Id*. at 88:6–25; *id*. at 89:1–5). At trial, defense counsel attempted to undermine A.S.'s credibility because she questioned her inability to recall certain details about the abuse during cross-examination. (*See* Doc. No. 12-4 at 92–93). In reference to her testimony, defense counsel stated during closing argument:

> Now, do you remember exactly what she said when? Do you remember whether she said these certain things at this time? Do you even remember that she knew when it happened, how old she was when it happened, where she was when it happened?

(Doc. No. 12-5 at 93: 16–20).

In rebuttal, the prosecutor's comments leading up to the PSA or "sending a message comment" was as follows and *did* initially prompt an objection from defense counsel:

> Prosecutor: [T]he defense does not want you to believe that A[.S.] is telling you the truth. But there are many, many reasons to believe that A[.S.] is telling us the truth. Now, when I was preparing to make the transition several years ago from a regular -- a prosecutor who had a general case load to specializing in child abuse prosecution, I did a fair amount

> of research on the issue. And in doing that on the issue of
> child sexual abuse and victimization, in doing that—

Ms. Harrison:  Your Honor, objection.

(*Id*. at 97:11–21). The trial court cautioned the prosecutor to "[m]ake sure it's related to this case." (*Id*. 22–23). The prosecutor then proceeded to talk about the PSA, stating, in part that children should not be expected to recall every detail of the abuse to be believed:

> [T]he message of that PSA can be distilled down into two words and was distilled down ultimately into two words that they flashed across the screen at the end. And those two words are "tell someone". The implication, of course, being that if you're a child being abused, tell someone and they'll believe you. You'll be protected, your abuse will stop, your abuser will be held accountable. And I was thinking about that last night as I was thinking about this section of my remarks. Because what occurred to me was what that PSA does not say is "tell someone but". If you really want to be believed, protected, have your abuser held accountable, try and make sure you don't come from a chaotic situation at home because they'll use that against you. And tell someone, but be sure you don't have any conflict with your mom because they'll use that against you. Or tell someone, but you better hope you have a competent DCS worker because otherwise your case is going to have problems. Or tell someone, but be sure to tell the story exactly the same way every time and be sure to remember to throw a lot of details in and be able to talk graphically about what happened to you in front of a bunch of strangers three years later. If you can do all those things, go ahead and tell someone. Otherwise don't bother. That's not what we tell our children, ladies and gentlemen.

(*Id*. at 97:24–25; *id*. at 98; *id*. at 99:1–6).

When examining the "prosecutor's comment[s] in context of the trial and the rest of her closing argument," *Wells*, 623 F.3d at 339, they can be read as a direct response to defense counsel's closing argument in which she attempted to undermine A.S.'s credibility based on her inability to recall precisely when and where the abuse occurred. (*See* Doc. No. 12-4 at 92–93 (testifying on cross-examination that sometimes she would remember the addresses of where and

when the abuse occurred)); *cf. Stewart v. Trierweiler*, 867 F.3d 633, 640 (6th Cir. 2017) ("The gist of the comment, if not all of its language, was 'invited by [and] responsive to' defense counsel's closing argument." (quoting *Darden v. Wainwright*, 447 U.S. 168, 182 (1986))). And similar to comment two, Petitioner does not account for this commentary "in context," *Young*, 470 U.S. at 11–14, "to determine [] [its] effect on the trial as a whole," *Darden*, 477 U.S. at 182. In other words, even if the prosecutor's comments in rebuttal fell "out of bounds," *Young*, 477 U.S. at 13, Petitioner has not shown that they were "so flagrant as to constitute a denial of due process and warranting granting a writ," *Millender v. Adams*, 187 F. Supp. 2d 852, 875 (E.D. Mich. 2002) (citation omitted). On habeas review, "[r]eversal is required only if the prosecutor's misconduct is so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Lundgren*, 440 F.3d at 778. The trial court, therefore, reasonably could have concluded that the prosecutor's commentary during the rebuttal closing was in "direct response to statements made by the defense throughout the trial and during the defense's closing argument." (Doc. No. 12-17 at 36).

Also, a trial court's curative instruction can leaven the risk of prejudice from a prosecutor's misconduct, particularly when the alleged misconduct is isolated. *See, e.g.*, *Trierweiler*, 867 F.3d at 640 ("The trial court's curative instructions also leavened any risk of prejudice from the prosecutor's and defense counsel's comments. Immediately after closing arguments, the judge instructed the jury that it may not let sympathy or the possible penalty influence its decision. He admonished the jury that it 'is your job and nobody else's' to decide the facts."). As this Court explained in the previous section, a review of the trial record shows that the trial court instructed the jury several times that statements from counsel are not evidence. *See Darden*, 477 U.S. at 183 ("The trial court instructed the jurors several times that their decision was to be made on the basis

of the evidence alone, and that the arguments of counsel were not evidence."). Immediately prior to closing arguments, the trial court instructed that "statements of counsel are not evidence. It's just to assist you in understanding the evidence." (Doc. No. 12-5 at 71:11–14). It reminded the jury, again, during closing argument that they were to "remember the testimony and rely upon [] [their] memory instead of what the attorneys say." (*Id*. at 84:2–4). During jury instructions, the trial court also informed the jury:

> Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them . . . . You are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony.

(*Id*. at 111:16–25; *id*. at114:24–25; *id*. at115:1). Petitioner fails to explain how the trial court's curative instructions were insufficient to cure a prejudicial effect from the prosecutor's commentary. *See CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) ("[J]uries are presumed to follow the court's instructions."); *see also Trierweiler*, 867 F.3d at 640–41 (reversing district court's grant of habeas relief because the state court's conclusion that the defendant received a fair trial due to the trial court's curative instructions was not contrary to or an unreasonably application of federal law).

Accordingly, the state court's rejection of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

iv. Comment 4: Comments Not in Evidence

As to comment four, the post-conviction court explained:

> The statements characterized in the amended petition as "comments by the defendant not in evidence" relate to the statements the Petitioner made during his recorded conversation with Ms.

84

Standbury [sic] and during his police interview—both of which were admitted into evidence. The Court finds the State's characterization of the Petitioner's recorded statements do not rise to error warranting a new trial. Moreover, the Court provided the jury with instructions during several parts of the trial that statements of counsel are not evidence. In the closing charge, the Court advised the jury, "You are the exclusive judges of the facts in this case." (Trial Tr. vol. II, at 310; Jury Charge, at 6). The Court finds the Petitioner has not met his burden on this issue and denies his request for a new trial on this ground.

(Doc. No. 12-17 at 37–38).

A prosecutor's reference to evidence not in the record, or misrepresenting evidence, can amount to improper conduct and can also mislead the jury in a prejudicial way. *See Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) ("Misrepresenting facts . . . can amount to substantial error because doing so 'may profoundly impress a jury and may have a significant impact on the jury's deliberations.'" (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974))). As a reminder, comment four included the following statements:

> You know, he owns up to all of that when he's talking to Latrice. He says specifically – she says, so were you playing or was it a touch. It was a touch. It was a touch. So you know, when I said I accidentally let m[y] finger slip inside of her while she was wearing her nightgown, what I meant to say is I intentionally touched her, I intentionally penetrated her genital opening. I intentionally raped her. I'm intentionally guilty of rape of a child. (Trial R. Vol. II, pp. 281–82).

(Doc. No. 12-5 at 85:23–25; *id*. at 86:1). The prosecutor's last few statements, when viewed in isolation, are concerning because Petitioner did not state that he "intentionally raped her [A.S.]" or that he was "intentionally guilty of rape" during the body-wire conversation with Ms. Standberry. (*Id*.); *see Hofbauer*, 228 F.3d at 700 ("[A]sserting facts that were never admitted into evidence may mislead a jury in a prejudicial way" (citation omitted)).

But again, a court must view a prosecutor's statements in context of the trial and the rest of her closing argument. And on the record before it, the post-conviction court reasonably could have concluded that they "relate[d] to the statements the Petitioner made during his recorded conversation with" Ms. Standberry, which *were* in evidence. (Doc. No. 12-17 at 37); *see Wells*, 623 F.3d at 339; *see also Gumm*, 775 F.3d at 381 (explaining that flagrancy is assessed based on "the totality of the circumstances") (internal quotation marks and citation omitted). Courts in this circuit, which this Court may consider "in assessing the reasonableness of a state court's resolution of an issue," have found that flagrancy is lacking when the commentary, even if it is improper, is tethered to the evidence. *Erwin*, 503 F.3d at 493 ("[W]hile the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive."); *see, e.g., Cleveland*, 65 F. Supp. 3d at 532–33 (determining that the prosecutor's statements were not flagrant because they were "tethered to the record evidence and d[id] not have the appearance of originating from the prosecutor's personal opinion or evidence outside that presented to the jury"); *cf. Cristini v. McKee*, 526 F.3d 888, 902 (6th Cir. 2008) ("Although the prosecutor called these witnesses 'liars,' this argument that they were lying was based on evidence in the record, and was not framed in such a way that would suggest the prosecutor knew of any outside evidence."); *United States v. Sherrill*, 388 F.3d 535, 538 (6th Cir. 2004) (concluding that the prosecutor's statement that "that man is guilty," even if improper, did not amount to flagrant misconduct, when read in context of the record).

During the body-wire conversation, Ms. Standberry questioned Petitioner on whether he "touched" A.S.:

| | |
|---|---|
| Ms. Standberry: | How . . . was she touched the wrong way? |
| Petitioner: | I did not pick her up by her legs, by her thigh just like that right here, you know, (inaudible) |

|  |  |  |
|---|---|---|
|  |  | and maybe she (inaudible) saying I touched her the wrong way. It's not like I came to her and put my finger up in her doing all this right here, just like that. |
| Ms. Standberry: | | Do you admit to any of it? |
| Petitioner: | | Yeah. |
| Ms. Standberry: | | There's a big difference, there's a big difference in— |
| Petitioner: | | Yeah, yeah. |
| Ms. Standberry: | | So you were touching her. |
| Petitioner: | | Yeah. |
| Ms. Standberry: | | You were touching her. |
| Petitioner: | | I didn't know, I didn't know, I'm saying to myself, it's not like I was trying to touch her in unappropriate [sic] way, in the way I picked them up, this right here. |

(Doc. No. 12-7 at 45).

|  |  |  |
|---|---|---|
| Petitioner: | | I'm saying the finger and stuff like that, yeah that happened. |
| Ms. Standberry: | | You fingered her. |
| Petitioner: | | I mean I didn't, like you know sit there and finger her like I (inaudible) no, she got her nightgown and something on this right here, a tee shirt on whatever. My finger probably touched her private or something like that right here. |

(*Id.* at 52).

The prosecutor's commentary during closing argument regarding whether Petitioner "touch[ed]" and "finger[ed]"A.S. was, therefore, in reference to this body-wire conversation. (Doc. No. 12-5 at 85:23–25; *id.* at 86:1). And her isolated statements during this commentary that Petitioner "intentionally raped" A.S. and was "intentionally guilty of rape of a child" was tethered

to those statements that were in evidence. (Doc. No. 12-5 at 85:23–25; *id*. at 86:1). They, therefore, do "not have the appearance of originating from . . . evidence outside that presented to the jury." *Cleveland*, 65 F. Supp. 3d at 532–33; *see Cristini*, 526 F.3d at 902 (determining that, although the prosecutor's statements that the witnesses were "liars" were deliberate, they were not flagrant because "[h]is arguments focused the jury on the evidence, not the prosecutor's personal opinion").

Petitioner, moreover, does not assert that the prosecutor's statements—that he "intentionally raped" A.S. or that he was "intentionally guilty of rape"—were pervasive throughout trial, and as already explained, the trial court reminded the jury several times that statements from counsel are not evidence. (Doc. No. 12-5 at 71:11–14 (stating immediately before closing argument that "statements of counsel are not evidence. It's just to assist you in understanding the evidence"); *see id*. at 84:2–4; *id*. at 111:16–25; *id*. at 114:24–25; *id*. at 115:1)); *see Johnson v. Bell*, 525 F.3d 466, 485 (6th Cir. 2008) (determining that the prosecutor's statement, while improper, was not flagrant when the trial court instructed the jury that '[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence'"). Petitioner, again, fails to explain how the trial court's curative instructions were insufficient to cure any prejudicial effect from the prosecutor's statements. *See Hensley*, 556 U.S. at 841 ("[J]uries are presumed to follow the court's instructions."). The trial court, therefore, on the record before it, reasonably could have concluded that "the State's characterization of the Petitioner's recorded statements d[id] not rise to error warranting a new trial." (Doc. No. 12-17 at 37–28).

For these reasons, the state court's rejection of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

### 3. Ground 6: Failure to Investigate and Present Evidence of Other Adult Male

Petitioner claims his trial attorneys rendered ineffective assistance of counsel because they failed to investigate other household members, including an adult named Donald Standberry—Ms. Standberry's brother and A.S.'s uncle—who lived with A.S. during the time of the allegations. (Doc. No. 1 at 30). According to Petitioner, presenting proof to the jury that Donald Standberry lived with A.S. "would have seriously called into question" whether he could have "repeatedly committed this abuse while another adult was in the home." (*Id.*) Also, Petitioner asserts that had trial counsel investigated "all the house member[s]," they "could have shown motive to lie about sexual abuse." (*Id.*)[15]

During the evidentiary hearing on Petitioner's petition for post-conviction relief, Petitioner's attorney questioned Ms. Harrison as to whether she remembered another adult male living in the house with Petitioner and his family:

> Q.     Do you have any memory of whether there was another adult male living in the household with Mr. Sanders and his family?
>
> A.      I do not think I knew that, but I don't really remember.

(Doc. No. 12-18 at 52:19–25). The Court also questioned Ms. Harrison on whether she would have followed up on investigating somebody else in the house if she had reason to believe somebody else lived with A.S.:

> Q.     So if Mr. Sanders had told you there was somebody else in the house, would you have followed up on that?
>
> A:      I would think I would.

(*Id.* at 63:17–20).

---

[15]     Aside from Donald Standberry, Petitioner does not identify any other household members whom his trial attorneys should have interviewed. (Doc. No. 12-1 at 30).

Petitioner testified during the evidentiary hearing that Donald Standberry lived with him, Ms. Standberry, A.S., and J.S. at Valley Brook Apartments and on Apache Trail. (*Id*. at 130:16–19; *id*. at 133:10–11). Elliot Sanders, Petitioner's older brother, testified that he would stay with Petitioner, A.S., Ms. Standberry at Valley Brook Apartments, and he confirmed that Donald Standberry lived there. (*Id*. at 72:20–24; *id*. at 77:11–13, 16–25).

The post-conviction court rejected this claim, finding that Petitioner failed to establish his burden that trial counsel was ineffective or that the alleged deficiency prejudiced him:

> First, as to the Petitioner's argument the uncle could have committed the offenses, the Court notes identity was not an issue in this case. The victim knew the Petitioner . . . , and she identified him as committing the act charged. The Petitioner also made admissions he engaged in inappropriate sexual behavior with the child. Trial counsel testified the defense theory was not mistaken identity; rather, the theory was the Petitioner's ex-wife had motive to make false allegations against the Petitioner due to issues in their relationship. The Court credits Trial Counsel's testimony and her strategic decision.
>
> As to the Petitioner's argument Mr. Standberry could have been a potential witness, the Petitioner did not call Mr. Standberry to testify at the post-conviction hearing. When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense or failed to effectively cross-examine a witness, these witnesses should be presented by the petitioner at the evidentiary hearing. See, e.g,, *Black v. State*,794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); *Scott v. State*, 936 S.W.2d 271, 273 (Tenn. Crim. App. 1996). As a general rule, this is the only way the petitioner can establish that (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness or call the witness to the stand resulted in the denial of critical evidence which caused the petitioner prejudice. *Black*, 794 S.W.2d at 757. This Court is not permitted to speculate on what a witness's testimony might have been if introduced by counsel.

(Doc. No. 12-17 at 23).

The TCCA agreed with the post-conviction court's determination that Petitioner failed to establish prejudice:

> The evidence does not preponderate against this finding. In the case of a petitioner who is able to establish that counsel was deficient in the investigation of a witness or failing to call said witness, the petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland*. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). Here, the post-conviction court noted that it was not permitted to speculate on what Mr. Standberry's testimony might have been if introduced by Counsel. Without the benefit of his testimony at the post-conviction hearing, this court similarly will not make a judgment as to whether M[r]. Standberry's testimony at trial or any facts within his knowledge, had they been investigated or presented, would have been favorable or material to the Petitioner's innocence. The Petitioner is not entitled to relief.

*Sanders*, 2020 WL 2394992 at *10.

Under *Strickland*, counsel has a duty to make reasonable investigations. 466 U.S. at 691. An attorney's decision not to investigate "must be directly assessed for reasonableness in all the circumstances," applying a heavy measure of deference to counsel's judgments. *Id*. Counsel's alleged error, however, "even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. "[T]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112 (citing *id*.).

The state courts reasonably could have concluded that Petitioner failed to establish prejudice under *Strickland*. The evidence from Petitioner's post-conviction hearing showed, at best, that Donald Standberry lived with Petitioner, A.S., Ms. Standberry, and J.S. at the Valley

Brook Apartments and the residence on Apache Trail. (Doc. No. 12-17 at 22 (post-conviction court's opinion); *see* Doc. No. 12-18 at 130:16–19; *id.* at 133:10–11 (Petitioner's post-conviction testimony)). As the state courts observed, Petitioner also did not call Donald Standberry to testify during his post-conviction hearing. Petitioner, therefore, provided no evidence that Donald Standberry "would have seriously called into question" whether he could have "repeatedly committed this abuse while another adult was in the home." (Doc. No. 1 at 30). Accordingly, what trial counsel could have uncovered had she investigated Donald Standberry is speculative. *See Rayner v. Mills*, No. 3:06-1187, 2010 WL 724010, at *8, *11 (M.D. Tenn. Mar. 1, 2010) (deferring to state court's determination that proof of prejudice under *Strickland* was speculative when the petitioner failed to produce witness during postconviction hearing); *cf. Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) ("The conclusion that the outcome of the trial would have been different if this evidence were presented is simply too speculative.").

For these reasons, the state court's conclusion that Petitioner failed to establish prejudice under *Strickland* was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

### 4. Ground 7: Failure to Cross Examine A.S.

Petitioner claims that trial counsel was ineffective for "failing to cross-examine A.S. about her disclosure and/or present this to the jury." (Doc. No. 1 at 33). In support of this claim, Petitioner highlights the timeframe in which A.S. disclosed the abuse allegations against him to Ms. Reilly— *i.e.*, four months *after* A.S. informed Ms. Reilly that Ms. Standberry was physically abusing her. (*Id.* (stating that "A.S. waited another four months and . . . disclosed the abuse by" him)). Petitioner also points to A.S.'s trial testimony in which she stated that she was afraid of losing Ms.

Standberry. (*Id*. at 33–34). Accordingly, Petitioner insists that had trial counsel pressed A.S. on the timeline of her disclosure, "it would have shown the jury that" A.S. had motive to lie about the sexual abuse—the motive being "to get Ms. Standberry out of trouble for" the physical-abuse allegations. (*Id*. at 34).

In his amended petition for post-conviction relief, Petitioner argued that trial counsel was ineffective for failing "to cross-examine A.S. about why she waited so long to disclose" the sexual abuse allegations. (Doc. No. 12-16 at 92). Post-conviction counsel did not specifically question Ms. Harrison on her failure to cross examine A.S. on this issue. But Ms. Harrison testified that her trial strategy, in general, was to impeach A.S., "but not so much because that's very tricky. I mean my strategy, you know, in front of a jury, you really don't want the jury hating you for really going after th[is] child." (Doc. No. 12-18 at 59:18–24). On cross-examination, Ms. Harrison stated that any failure to cross examine A.S., in general, would have been strategic:

> Q.     So if you did not make objections during the direct examination by A.S. [at trial], who was the victim in this case, would that have been a tactical decision?
>
> A.     Yes.

(*Id*. at 60:5–8).

This line of questioning prompted a follow-up question from Petitioner's post-conviction counsel:

> Q.     The state asked you about strategic decisions as far as cross examining the child in this case. And you said you did make strategic decisions, were trying to strike a balance, correct?
>
> A.     Uh-huh. Uh-huh. Yes.

(*Id*. at 61:20–24).

The post-conviction court, in rejecting this claim, determined that Petitioner failed to meet his burden of proving that counsel was ineffective for the following reasons:

93

Trial Counsel testified about the difficulty in cross-examining children and explained she made tactical decisions as to how to approach the child victim in this case. She explained instead of aggressively questioning the child, her trial strategy focused on cross-examining the child's mother "as aggressively as possible." The Court finds Trial Counsel's testimony credible and that Trial Counsel made a reasonably based strategic decision. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994) (holding that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel"); *see also Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991); *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991) (finding "cross-examination is a strategic and tactical decision of trial counsel which is not to be measured by hindsight"); *State v. Martin*, 627 S.W.2d 139, 142 (Tenn. Crim. App. 1981).

The Court of Criminal Appeals has "acknowledge[d] the unique difficulty of cross-examining a child at trial, especially concerning the sensitive issue of sexual abuse" and Trial Counsel's cross-examination demonstrated she was prepared and aware of the child's previous statements. *Steven Gass v. State*, No. M2003-01079-CCA-R3PC, 2004 WL 1434475, at *2 (Tenn. Crim. App., at Nashville, June 25, 2004) (quoting *Jimmy Greene v. State*, No. E2000-00426-CCA-R3-PC, 2001 WL 237343, at *10 (Tenn. Crim. App., at Knoxville, Mar. 6, 2001)). Although Post-Conviction Counsel disagrees with the tactic and would have pursued an alternative strategy does not undermine the validity of the strategic decision employed by Trial Counsel. The Petitioner has failed to establish by clear and convincing evidence that Trial Counsel was ineffective nor has he established he was prejudiced by any alleged deficiency.

(Doc. No. 12-17 at 24–25).

The TCCA agreed with the post-conviction court's determination:

Counsel made the tactical decision not to 'go after' the victim but instead to aggressively challenge her mother. This is another tactical decision that is within Counsel's purview to make based on her twenty-two years of experience with juries in criminal trials and we will not second guess her decision . . . . The same tactical reasoning applied to Counsel's decision not to attack the victim with regards to this aspect of the case [cross-examining A.S. regarding her disclosure], and our analysis is the same. The Petitioner is not entitled to relief.

94

*Sanders*, 2020 WL 2394992 at *12–13.

Here, the record from Petitioner's trial shows that trial counsel *did* question A.S. to some extent on the timeline of her disclosure of the sexual-abuse allegations to Ms. Reilly:

> Q. Miss Standberry, you reported to your school counselor, Peggy Reilly, in January of 2008 that Henry Sanders touched you inappropriately; is that right?
>
> A. I don't know about the date. But, yes, I reported to my counselor.

(Doc. No. 12-4 at 82:24–25; *id*. at 83:1–3).

So, although Petitioner faults counsel for "failing to cross-examine A.S. about her disclosure" the state-court record belies his contention. (Doc. No. 1 at 33).

In addition, the TCCA reasonably could have concluded that trial counsel's performance was not deficient based on the record before it. "Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Jackson v. Bradshaw*, 681 F.3d 753, 765 (6th Cir. 2012) (internal quotation marks and citation omitted). Ms. Harrison testified during the post-conviction hearing that she did not want to impeach A.S. "so much" because "you really don't want the jury hating you." (Doc. No. 12-18 at 59:18–24). She therefore chose to cross examine Ms. Standberry "as aggressively as possible." (*Id*. at 59:25). A review of the post-conviction record shows that Petitioner did not attempt to rebut the strong presumption that trial counsel's conduct "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks and citation omitted); (*see* Doc. No. 12-16 at 92–93; Doc. No. 12-17 (post-hearing brief)); *see also Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) ("Conclusory allegations of ineffective assistance of counsel, without any evidentiary support, do not provide a basis for habeas relief."). In line with *Strickland*, it was therefore reasonable for the TCCA to indulge in the presumption that trial counsel's decision to more aggressively cross

95

examine Ms. Standberry instead of A.S.—a child abuse victim—was "another tactical decision." *Sanders*, 2020 WL 2394992 at \*12; *see Blunkall v. Boyd*, No. 1:19-cv-00042, 2022 WL 162957, at \*29 (M.D. Tenn. Jan. 18, 2022) ("Counsels' strategy of avoiding an overtly antagonist posture with the victim [of child abuse] was presumptively sound." (citing *Strickland*, 466 U.S. at 689)).

For these reasons, the state court's rejection of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

5. Ground 8: Failure to Object to and Cross Examine Expert Witness

Petitioner claims that trial counsel was ineffective "for failing to object to and cross-examine" Ms. Gallion regarding her expert opinions on "physical diagnostic findings in child sexual abuse victims." (Doc. No. 1 at 38). The physical diagnostic findings that Petitioner refers to is Ms. Gallion's trial testimony "that ninety-three percent of children alleging sexual abuse do not have physical findings." (*Id*. at 39).

Respondent argues that the TCCA did not unreasonably apply *Strickland*. (Doc. No. 13 at 56). According to Respondent, trial counsel "expressly objected to Ms. Gallion as an expert and providing irrelevant testimony," and "the trial court in turn severely curtailed what Ms. Gallion could say as a trial witness." (*Id*. at 59). Respondent asserts that it is therefore "unclear on what basis trial counsel could have successfully thwarted the expert qualification" of Ms. Gallion. (*Id*.) In addition, Respondent argues that Ms. Gallion's full testimony during post-conviction proceedings was cumulative to her trial testimony. (*Id*. at 60). Under the AEDPA's double deferential standard of review, Respondent maintains that, for these reasons, Petitioner cannot show the TCCA's rejection of this claim was an unreasonable application of *Strickland*. (*Id*.)

96

The post-conviction court found that Petitioner failed to meet his burden of proving that counsel's performance was deficient or prejudicial:

> As reflected by the trial transcript, the Court qualified Ms. Gallion as an expert in the area of pediatric nursing and forensic examinations, and Ms. Gallion testified about limited issues in the jury's presence. *Id*. at 230–41. Since most of Ms. Gallion's testimony related to explaining general anatomy, [Counsel] focused the cross-examination on the fact Ms. Gallion had not examined the victim in the case and, therefore, was not able to testify as to whether she observed any sign of abuse. *Id*. at 240–41. At the post-conviction hearing, [post-conviction] counsel further []examined Ms. Gallion, focusing on her testimony related to the 93% statistic and an article authored by Ms. Gallion, which was published in 2016 and admitted as Exhibit 6. The Court noted from the bench that Ms. Gallion's article did not exist at the time of trial; nevertheless, Ms. Gallion testified that nothing in her later published article changed the findings she testified to at the Petitioner's trial. Based on the evidence before the Court, the Court finds the Petitioner has failed to show by clear and convincing evidence that trial counsel was ineffective as to her handling of Ms. Gallion's expert testimony or that he was prejudiced by the alleged deficiency.

(Doc. No. 12-17 at 30).

The TCCA agreed with the post-conviction court's rejection of this claim:

> The evidence does not preponderate against the court's findings. At the postconviction hearing, Ms. Gallion testified that her trial testimony was general in nature regarding child abuse nationwide and the literature surrounding it. As she did not examine the victim prior to testifying at trial, the trial court limited her testimony on that basis to briefly cover the topic of physical examinations of child victims generally, which included a study reporting the statistic that victims do not show physical signs of abuse in ninety-three percent of cases. Counsel . . . lodged several objections to Ms. Gallion's testimony, based on her lack of direct contact with the victim and the lack of an expert report submitted by her. Counsel cross-examined Ms. Gallion about her general research as a pediatric nurse, and at the post-conviction hearing, Ms. Gallion testified that her trial testimony had been affirmed by her later, more specific research. If anything, as the State notes in its brief, further questioning of Ms. Gallion at trial would have resulted in more testimony that would have been harmful to the Petitioner's case. Based on this evidence, the Petitioner has not shown that Counsel's

decisions surrounding her cross-examination of Ms. Gallion fell below reasonable standards of representation and we will not second guess Counsel's strategy on appeal. Further, the Petitioner has not demonstrated how he was prejudiced by Counsel's representation in this regard. The Petitioner is not entitled to relief.

*Sanders*, 2020 WL 2394992 at *7.

Petitioner has not shown that the state courts' rejection of this claim was "contrary to" or involved an "unreasonable application of" *Strickland*. 28 U.S.C. § 2254(d)(1). The trial record shows, as the post-conviction court noted, that Ms. Harrison objected to the state's use of Ms. Gallion as a witness for two reasons. (Doc. No. 12-17 at 29). First, she objected to Ms. Gallion as a witness on relevance grounds "because of the fact that there was no medical exam done here" on A.S. (Doc. No. 12-4 at 200: 18–19). And that Ms. Gallion "would testify as to medical exams in general," Ms. Harrison argued, was therefore irrelevant. (*Id*. at 21–23). Second, Ms. Harrison objected to the state's use of Ms. Gallion as an expert witness due to inadequate notice because the prosecution informed her just before trial that they would be using Ms. Gallion as an expert witness. (*Id*. at 200:25; Doc. No. 12-5 at 5:1–4, 17–20). Following Ms. Gallion's jury-out testimony, Ms. Harrison renewed her objections. (Doc. No. 12-5 at 21–22). The trial court, however, decided that Ms. Gallion could testify on the general anatomy of the vagina, the kinds of exams Ms. Gallion performs, and "that ninety-three percent of exams are normal." (*Id*. at 23:15–25).

Under *Strickland*, the performance inquiry must be whether "counsel's assistance was reasonable considering all the circumstances[,]" and there "are countless ways to provide effective assistance in any given case." 466 U.S. at 690. In addition, courts must "evaluate the conduct from counsel's perspective at the time." *Id*. at 669. Given the trial court's ruling that Ms. Gallion *could* testify that ninety-three person of children who are sexually abused have no physical injury, the

state courts reasonably could have concluded that a competent attorney may elect to forego cross-examination on that issue. In addition, trial counsel did cross examine Ms. Gallion, albeit focusing her line of questioning on whether she personally examined A.S.:

> Q.     Ms. Gallion, you never did an examination on A[.S.], did you?
>
> A.     I did not.
>
> Q.     You have no idea what her genital anatomy is like, do you?
>
> A.     I do not.
>
> Q.     You have no idea what the result of an exam on her would yield, do you?
>
> A.     No, I do not.

(*Id.* at 44:25; *id.* at 45:1–8). Petitioner's arguments, therefore, that trial counsel did not specifically question Ms. Gallion on her physical diagnostic finding—that ninety-three percent of exams are normal—read as a mere disagreement with his trial attorney's strategy in cross examining Ms. Gallion. However, "[c]ounsel's failure to employ a trial strategy that, in hindsight, might have been more effective, does not constitute unreasonable performance" under *Strickland*. *Cardwell v. Netherland*, 971 F. Supp. 997, 1019 (E.D. Va. 1997) (citing *Strickland*, 466 U.S. at 689)*; see Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002) ("Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." (citation omitted)).

The TCCA's conclusion therefore that "Petitioner ha[d] not shown that Counsel's decisions surrounding her cross-examination of Ms. Gallion fell below reasonable standards of representation," *Sanders*, 2020 WL 2394992 at *7, was not "so lacking in justification that there

was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

6.  Ground 9: Failure to Obtain Victim's Forensic Interview

Petitioner claims that trial counsel was ineffective for failing "to obtain a copy of A.S.'s forensic interview for use at trial." (Doc. No. 1 at 41). In support of this claim, Petitioner highlights portions of the forensic interview in which A.S. told the interviewer that J.S. and Petitioner's daughter Cora Roberts were present during some of the incidences of sexual abuse. (*Id*. at 42). However, at trial, Petitioner maintains that A.S. denied that "anyone else witnessed the incidents." (*Id*. at 41). As a result of trial counsel's failure to obtain the transcript of the forensic interview, Petitioner argues that trial counsel could not cross examine A.S. on this "material inconsistenc[y]," and other inconsistencies, in her trial testimony. (*Id*.) According to Petitioner, these other inconsistencies include the following:

- During the forensic interview, A.S. denied that Ms. Standberry struck her. However, at trial, A.S. testified that Ms. Standberry did hit her with a hairbrush.

- During the forensic interview, A.S. stated that the abuse occurred at Valley Brook Apartments and denied there were additional incidents after Petitioner and Ms. Standberry broke up. However, at trial, A.S. testified that specific incidents of abuse occurred after Petitioner and Ms. Standberry broke up, and they occurred at Petitioner's apartment on Linbar Drive.

(*Id*. at 45–46). In addition, Petitioner states that he "disagrees with [the trial court's] findings that all inconsistencies were addressed at trial." (*Id*. at 48).

Petitioner raised this claim, that trial counsel was deficient in failing to obtain the transcript of the forensic interview, in his petition for post-conviction relief. During the evidentiary hearing, Ms. Harrison testified that she could not remember if she ever obtained a copy of the forensic interview, but she recalled listening to it. (Doc. No. 12-18 at 56:23–25; *id*. at 57:1–3). Petitioner's

100

post-conviction attorney then asked Ms. Harrison if the forensic interview would have been "material" had A.S. said "something in the forensic interview and then denied it" at trial. (*Id*. at 61:25; *id*. at 62:1–3). Ms. Harrison responded that she "c[ouldn]'t really say." (*Id*. at 62:4). She added that she typically would question a witness regarding an inconsistent statement, but "when you're dealing with children, you do it differently." (*Id*. at 62:10–12).

In his post-hearing brief, Petitioner highlighted, as he does in his Petition, the relevant portions of A.S.'s forensic interview in which she stated that Cora and J.S. witnessed the abuse:

> Interviewer: [J.S. was] [i]n his room. Would he [J.S.] see what would happen?
>
> A.S.: Yes, but he may not know what it is.
>
> Interviewer: Yes, but he doesn't know what it is. How do you know that your brother saw what happened?
>
> A.S.: Because he always be looking at his daddy.
>
> Interviewer: 'Cause he's always looking at his daddy.
>
> A.S.: Yeah, and he would tell his daddy to get off of me.
>
> Interviewer: He'd tell his daddy to get off of you. Would something happen when you would say this?
>
> A.S.: He would hurt, he'll, my brother hurt his daddy.
>
> Interviewer: How would he hurt him?
>
> A.S.: He would hit him with a toy.
>
> Interviewer: Hit him with a toy. Would something happen to your brother?
>
> A.S.: No, he would just get off.
>
> Interviewer: Does Henry touch your brother somewhere?
>
> A.S.: No.

| Interviewer: | No. Okay. How many times has your brother seen something happen to you with Henry? |
| --- | --- |
| A.S.: | A lot. |
| Interviewer: | A lot. Okay. Does— |
| A.S.: | Even his daughter. |
| Interviewer: | Huh? |
| A.S. | Even his daughter. |
| Interviewer: | Even his daughter. Who is his daughter? |
| A.S. | Cora. |
| Interviewer: | Cora. How old Cora? |
| A.S.: | She's six. |
| Interviewer: | Six. How do you know that she's seen something happen? |
| A.S.: | Because she always be looking at him. |
| Interviewer: | Okay. Does she say something or do something? No. Where is she at when this happens? |
| A.S.: | In his [Petitioner's] room. |
| Interviewer: | In his room. And where are you at when this happens? |
| A.S.: | In his [Petitioner's] room [inaudible] Cora. |

(Doc. No. 12-16 at 118–19 (post-hearing brief); *see* Doc. No. 12-1 (Petition); *see* also Doc. No.

12-22 at 34–35 (forensic interview transcript)).

The post-conviction court determined that Petitioner failed to meet his burden of proving trial counsel was ineffective:

> Related to the cross-examination and impeachment of the child victim, the Petitioner contends trial counsel was ineffective for failing to obtain a transcript of the forensic interview, which was introduced at the post-conviction hearing as late-filed Exhibit 15. The petition provides:
>
>> Trial counsel failed to obtain a transcript of A.S.'s forensic interview in the Spring of 2008, which contained several issues about which she should have been cross-examin[ed] and/or impeached. Those issues included A.S.'s statements to the forensic interview[er]: that no one else was in the house when the alleged abuse occurred, Cora witnessed the abuse, J[.S.] witnessed the abuse and commented on it, that she could not remember the last time Mr. Sanders touched her, and A.S.'s denial that her mother hit her and left marks. As far as post-conviction counsel is aware, no transcript of this interview was ever completed, and A.S. was not impeached with these questions at trial . . . .
>
> Counsel's cross-examination demonstrated she [trial counsel] was prepared and aware of the child's previous statements. Nothing in the record suggests Trial Counsel was ineffective in handling the discrepancies in the victim's story at trial.

(Doc. No. 12-17 at 25).

> The Court has reviewed the interview transcript and the transcript of the victim's trial testimony[] and finds no significant discrepancies. Initially, during the forensic interview, the victim indicated she felt compelled to submit to the Petitioner's requests "[b]ecause there was nobody in the house, and if [she] screamed he'll [the Petitioner] cover [her] mouth." (Ex. 15, Forensic Interview Tr., at 14, lines 13-14). Shortly thereafter, however, the victim described how some of the incidents occurred when her brother and "Cora" (her step-sister) were present in the home although the victim was not sure if they had seen anything; she just assumed the other children might have because they were "always be looking at [their daddy]." *Id*. at 31-32. Although the victim did not mention the presence of Cora during her trial testimony, the victim did testify about the presence of her brother, as she had done during the forensic interview. (Trial Tr., vol. I 66-70).

The victim's brother was six years old at the time of Petitioner's trial in 2011, making him two or three years old at the time of the offenses. (Trial Tr., vol. I, at 28, 65, 121, 122). During the forensic interview in 2008, the victim indicated Cora was six years old. (Ex. 15, at 32).[] Given both the victim's brother and step-sister were young children, even if they had witnessed interactions between the Petitioner and the victim they may not have understood what was happening or have been able to provide any meaningful testimony. Regardless, the Petitioner did not call either the victim's brother or Cora to testify as to whether they witnessed any abuse. This Court may not speculate as to their testimony, and the Petitioner has failed to meet his burden on this issue. *Black*,794 S.W.2d at 757.

Concerning the victim's discrepancies as to whether her mother hit her with a hairbrush, the victim testified on cross-examination that her mother repeatedly hit her. (Trial Tr., vol. I, at 94). Although the victim denied her mother had harmed her during the forensic interview, the record reflects Trial Counsel used the child's trial testimony about prior physical abuse to support the defense theory that the victim had been coerced by her mother to make up the [sexual abuse] allegations. For instance, Trial Counsel cross examined the victim about how she was intimidated by her mother and would do what her mother said, implying the child had lied about the abuse. *Id*. at 95. The Court finds Trial Counsel made a reasonably based strategic decision. The Petitioner has failed to establish by clear and convincing evidence that Trial Counsel was ineffective nor has he established he was prejudiced by any alleged deficiency.

(*Id*. at 27).

On appeal, Petitioner argued that trial "counsel failed to procure a transcript of the forensic interview, which prohibited the defense from proving A.S.'s inconsistent statements to the jurors." (Doc. No. 12-25 at 42). The TCCA, however, rejected Petitioner's claim:

The Petitioner contends that Counsel was ineffective for failing to obtain a transcript of the victim's forensic interview and when she cross-examined the victim about her accusations without utilizing a transcript to impeach the victim. The Petitioner claims that the victim's multiple inconsistencies were ripe for impeachment but that Counsel failed to challenge the victim about her inconsistent testimony and did not have a transcript of the interview to support such a challenge. The State responds that Counsel was aware of the victim's inconsistencies but chose not to challenge the victim in

104

> regards to them because it would have angered the jury and would
> not have helped the Petitioner's case. Thus, the State argues that
> Counsel's representation was not ineffective in this regard. We
> agree with the State.

*Sanders*, 2020 WL 2394992 at *11.

> Counsel testified that she reviewed the video recording before trial
> and could have challenged the victim on her inconsistent statements
> but Counsel knew this would be tricky given the victim's age.
> Counsel made the tactical decision not to "go after" the victim but
> instead to aggressively challenge her mother. This is another tactical
> decision that is within Counsel's purview to make based on her
> twenty-two years of experience with juries in criminal trials and we
> will not second guess her decision here.

*Id*. at *13.

In applying *Strickland*, the Sixth Circuit has recognized that "[t]he idea that trial counsel

may have been 'more effective[ ] in his impeachment had he taken another course is precisely the

sort of second-guessing of a tactical judgment that *Strickland* counsels against." *Moss v. Olson*,

699 F. App'x 477, 487 (6th Cir. 2017) (quoting *Esparza v. Sheldon*, 765 F.3d 615, 624 (6th Cir.

2014)); *see Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 607 (E.D. Mich. 2001) ("Whe[n], as here,

trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure

to employ a trial strategy that, in hindsight, might have been more effective does not constitute

unreasonable performance for purposes of an ineffective assistance of counsel claim." (citations

omitted)).

Again, Petitioner claims that, due to trial counsel's failure to obtain a copy of the transcript

of the forensic interview, trial counsel "did not impeach" A.S. at trial based on her prior

inconsistent statements. But the trial record shows that Ms. Harrison did impeach A.S. on the

inconsistencies Petitioner raises in his Petition, notwithstanding that she did not obtain a copy of

the forensic interview. Petitioner's trial counsel questioned A.S. on cross-examination as to whether she told the forensic interviewer that Cora or J.S. witnessed any incidents of sexual abuse:

> Q. Okay. Now, back when you were talking to Ms. Alisha [the forensic interviewer], didn't you tell her that you thought your little brother, J[.S.], saw this happen?
>
> A. No.
>
> Q. You didn't say that?
>
> A. No.
>
> Q. And what about your stepsister, Cora?
>
> A. No.
>
> Q. You never said that to Ms. Alisha?
>
> A. No, ma'am.

(Doc. No. 12-4 at 87:1–13).

In addition, although trial counsel did not possess the transcript of the forensic interview itself to impeach A.S.'s trial testimony on direct examination that Ms. Standberry physically abused her, the record shows that trial counsel, nonetheless, attempted to discredit A.S.'s trial testimony on this issue through the cross-examination of Ms. Standberry:

> Q. Ms. Standberry, did you physically beat A[.S.]?
>
> A. Did I physically beat her? No.
>
> Q. Did you hit her in the head with a hairbrush?
>
> A. Not that I recall, no.
>
> Q. You know that A[.S.] reported that you physically abused her, correct?
>
> A. Yes.
>
> Q. So was she lying?

> A.  I'm not going to say she was lying. But if I was not -- no charges were brought against me, then I don't know.
>
> Q.  Well, did you do it?
>
> A.  No.
>
> Q.  Okay. She said you did it.
>
> A.  Okay.
>
> Q.  So was she lying.
>
> A.  No. My word against hers.

(*Id*. at 138:20–25; *id*. at 139:1–12).

Trial counsel also cross-examined Ms. Standberry on inconsistencies as to *where* the incidents of abuse occurred. Again, Petitioner contends that one of the inconsistencies between A.S.'s statements during the forensic interview and her trial testimony is that A.S. testified that two incidents of abuse occurred at Petitioner's apartment on Linbar Drive, but during the forensic interview, she mentioned that the abuse occurred at Valley Brook Apartments. (Doc. No. 12-1 at 47). During cross-examination of Ms. Standberry, Petitioner's trial attorney elicited testimony from her that tended to discredit A.S.'s testimony on direct examination that some of the abuse occurred on Linbar Drive:

> Q.  Now, after you [and Petitioner] split up, did A[.S.] ever spend the night at [Petitioner]'s house?
>
> A.  I don't recall. If she did, it would have been some type of baby-siting [sic] arrangement. But after we split up, there shouldn't have been no reason at all for her to spend the night at his house.

(*Id*. at 140:19–24). Given trial counsel's efforts to impeach A.S. and Ms. Standberry through cross-examination, the state courts reasonably could have concluded that trial counsel was not deficient in failing to obtain a copy of the forensic interview. *Cf. Moss*, 699 F. App'x at 486–87 (determining

that trial counsel's "substantial effort to impeach" the witness during her cross-examination, despite his failure to impeach the witness with a police report, did not undermine presumption that trial counsel's conduct fell "'within the wide range of reasonable professional judgment'" (quoting *Strickland*, 466 U.S. at 689)). Petitioner, in essence, disagrees with the method his trial attorney used to impeach A.S. However, "[i]mpeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Straub*, 194 F. Supp. 2d at 651 (citation omitted). Also, although he states that he "disagrees" with the post-conviction court's findings that "all inconsistencies were addressed at trial," (Doc. No. 1 at 48), for the reasons already explained, the post-conviction court's finding that trial "Counsel's cross-examination demonstrated she was prepared and aware of the child's previous statements" was not objectively unreasonable based on the record before it. (Doc. No. 12-17 at 25); *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." (citing 28 § 2254(d)(2))); *see Wood*, 558 U.S. at 301 ("[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" (citation omitted)).

 For the foregoing reasons, the state court's rejection of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

2. Ground 10: Failure to Interview and Present Evidence of Character Witness

Petitioner claims trial counsel was ineffective for failing to interview Ms. Roberts and "to present character and substantive evidence from" her. (Doc. No. 1 at 52). According to Petitioner,

counsel was deficient in failing to subpoena her as a trial witness. (*Id*.) Petitioner asserts that Ms. Roberts was "a potentially important witness due to the fact" that she knew him for many years, and they shared a child together. (*Id*.)

The TCCA summarized the evidence from Petitioner's post-conviction hearing as to this claim as follows:

> Counsel attempted to speak to Angela Roberts, with whom the Petitioner shared a daughter [Cora], but Ms. Roberts was uncooperative . . . . The Petitioner stated that he had children with . . . [Ms.] Roberts. Counsel had contacted Ms. Roberts about testifying on the Petitioner's behalf about his good parenting; Ms. Roberts, however, did not testify at his trial.

*Sanders*, 2020 WL 2394992 at *5. Ms. Roberts did not testify at Petitioner's post-conviction hearing, because, based on the state-court record, post-conviction counsel had difficulty locating her. (Doc. No. 12-18 at 118:14–25).[16] The TCCA agreed with the post-conviction court's determination that Petitioner had failed to show that trial counsel's performance was deficient or that he was otherwise prejudiced by counsel's performance. It summarized the post-conviction court's findings:

---

[16]     The Court's review of the record shows that post-conviction counsel attempted to submit as evidence a disk containing a phone conversation between Ms. Robert's and trial counsel's investigator. The post-conviction court, in its opinion rejecting Petitioner's petition for post-conviction relief, summarized the contents of that phone conversation in a footnote. (Doc. No. 12-17 at 41 n.19). According to this footnote, Ms. Roberts credited Petitioner as being a good father to their daughter Cora, stated that Petitioner was "a good guy," stated that she had known Petitioner for "approximately 9-10 years at the time of the phone call," and denied having knowledge that Petitioner abused children prior to the charges against him. (*Id*.) However, the trial court only permitted its admission as an offer of proof, not as evidence, because it found that Petitioner's post-conviction counsel "didn't do" her "due diligence in terms of cross examining" Ms. Harrison. (*Id*.) On appeal, Petitioner explained that the post-conviction court's ruling based on this footnote, stating that he "respectfully disagree[d] with the court's analysis on this issue," (Doc. No. 12-25 at 89 n.19), but the TCCA's opinion is silent on this issue, *see Sanders*, 2020 WL 2394992 at *1–14. Ordinarily, a state court's evidentiary ruling is not to be questioned in a federal habeas corpus proceeding, *Seymour*, 224 F.3d at 552, unless it is a ruling that "is especially egregious and results in a denial of fundamental fairness" *Wilson v. Sheldon*, 874 F.3d 470, 475 (6th Cir. 2017) (internal quotation marks and citation omitted)). Petitioner, however, in his Petition before this Court does not mention the disk, let alone craft any argument that the trial court's evidentiary ruling rises to the level of fundamental unfairness that could entitle him to habeas relief. (Doc. No. 1 at 52–53).

> The Petitioner alleges trial counsel was [in]effective for
> failing to interview . . . Angela Roberts. . . . . The Petitioner
> submits Ms. Roberts "could have offered testimony that: she
> and [the Petitioner] previously dated and had a child
> together, at times [the Petitioner] had sole custody of their
> female child, and that their child never reported any unusual
> or inappropriate behavior from [the Petitioner] . . . . The
> Petitioner was unable to locate Ms. Roberts to testify at the
> post-conviction hearing, and there is no proof she even was
> available as a witness at the time of the trial. Most
> significantly, . . . Ms. Roberts . . . [did not] testif[y] before
> this Court. Since this Court is not permitted to speculate on
> what a witness's testimony might have been if introduced by
> counsel, (*Black*, 794 S.W.2d at 757), the Court finds the
> Petitioner has failed to establish by clear and convincing
> evidence that [Counsel] was ineffective by not calling either
> witness nor has he demonstrated he was prejudiced by the
> alleged deficiency.

*Sanders*, 2020 WL 2394992 at *13.

> As we have stated, a petitioner is not entitled to relief from his
> conviction on this ground unless he can produce a material witness
> who (a) could have been found by a reasonable investigation and (b)
> would have testified favorably in support of his defense if called.
> Otherwise, the petitioner fails to establish the prejudice requirement
> mandated by *Strickland*. *Black v. State*, 794 S.W.2d 752, 757-58
> (Tenn. Crim. App. 1990). Here, Counsel attempted to contact Ms.
> Roberts; Counsel testified that she was not cooperative. Because the
> Petitioner's [sic] did not present her as a witness at the post-
> conviction hearing, we have no indication as to whether her
> testimony would have been favorable to his case. As such, the
> Petitioner is not entitled to relief on this issue.

*Id*.

Again, to establish prejudice under *Strickland*, "the likelihood of a different result must be

substantial, not just conceivable." *Harrington*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).

Given that Ms. Roberts did not testify at the post-conviction hearing, "[t]he conclusion that the

outcome of the trial would have been different . . . is simply too speculative." *Seymour*, 224 F.3d

at 557; *see Delosh v. Upton*, No. 1:20-cv-01262, 2024 WL 844942, at *10 (W.D. Tenn. Feb. 28,

2024) ("The TCCA did not unreasonably apply the prejudice prong because Petitioner did not

110

present the testimony of any exculpatory witnesses at his evidentiary hearing." (citation omitted));

*cf. Moreland v. Bradshaw*, 635 F. Supp. 2d 680, 712 (S.D. Ohio 2009) (failing to "come forth with any proof" of expert witness's testimony was "fatal" to the petitioner's claim that "the results of the proceedings would have been different"). On the record before them, the state courts, therefore, reasonably could have concluded that Petitioner failed to establish that his trial attorney's conduct prejudiced him. *Sanders*, 2020 WL 2394992 at *13; (Doc. No. 12-17 at 41 (post-conviction court's opinion)).

For these reasons, the state court's rejection of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

## C. Cumulative-Error Claim – Ground 11

Petitioner raises a cumulative-error claim as his final ground for relief. (Doc. No. 1 at 55–56). Petitioner presents this claim as a question: "Whether the cumulative performance of trial counsel and appellate counsel fell below the standards for representation and was so deficient that" he "was prejudiced and is entitled to a new trial?" (*Id*.) In support of this claim, Petitioner asserts that the combination of trial counsel's individual errors "absolutely merits the grant of post-conviction relief and reversal of his conviction." (*Id*. at 55). According to Petitioner, counsel should have put together a meaningful defense by: (1) challenging Ms. Gallion's testimony; (2) proffering an expert in false confessions to educate jurors; (3) presenting evidence of another adult male living in the victim's home at the time of the abuse; (4) investigating "allegation[s] of physical abuse A.S. made to" Ms. Reilly; (5) obtaining a transcript of the forensic interview and impeaching A.S. on "inconsistent material facts"; (6) presenting character evidence through Ms.

111

Roberts; (7) objecting to multiple improper statements during the state's closing arguments; and (8) cross examining A.S. about "the key issue of disclosure." (Doc. No. 1 at 55–56).

Respondent argues, and the Court agrees, that this claim is not cognizable in this proceeding. (Doc. No. 13 at 65). The Sixth Circuit has recognized that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to warrant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Accordingly, post-AEDPA, the "proposition that cumulative" errors can serve as a basis for habeas relief is without merit. *Moore v. Parker*, 425 F.3d 250, 256–57 (6th Cir. 2005). Petitioner, therefore, is not entitled to relief as to this claim.

## IV. CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal. *See* Rule 11(a) of the Rules Governing Section 2254 Cases (explaining that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant"). Rule 22 of the Federal Rules of Appellate Procedure provides that an appeal of the denial of a habeas petition may not proceed unless a COA is issued under 28 U.S.C. § 2253. Fed. R. Civ. P. 22(b)(1). A court may issue a COA only if the applicant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A substantial showing is made when "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (internal quotation marks and citations omitted). A petitioner, specifically, "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id*. at 484.

112

The Court finds that no reasonable jurist would differ on its disposition of any of the claims Petitioner raises in his Petition. It therefore declines to issue a COA. In addition, for the same reasons the Court declines to issue a COA, it finds that any appeal from this Memorandum Opinion and Order would not be taken in good faith. *See* Fed. R. App. P. 24(a)(3)(A) (providing that a "party who was permitted to proceed in forma pauperis in the district court . . . may proceed on appeal in forma pauperis" unless a district certifies that the appeal "is not taken in good faith"). As such, if Petitioner files a notice of appeal, he is **DENIED** leave to appeal *in forma pauperis*.

## V.     CONCLUSION

For the foregoing reasons, the petition for habeas corpus, filed under 28 U.S.C. § 2254, (Doc. No. 1) is **DENIED**, and this action will be **DISMISSED**. An appropriate Order shall enter.

_____

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

113